# UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| FRANKLIN EQUIPMENT COMPANY, ) | |
| ) | Case No. 08-74473-SCS |
| *Debtor.* ) | |
| ) | |
| ROGER DRAKE, ) | |
| ) | APN 09-07027-SCS |
| *Plaintiff*, ) | |
| ) | |
| v. ) | |
| ) | |
| FRANKLIN EQUIPMENT COMPANY, ) | |
| CAROLYN L. CAMARDO, ) | |
| CHAPTER 7 TRUSTEE, ) | |
| ) | Chapter 7 |
| *Defendants*. ) | |

## MEMORANDUM OPINION

This matter comes before the Court upon the Motion for Partial Summary Judgment filed on

May 13, 2009, by Roger Drake against the Debtor and the Chapter 7 Trustee, Carolyn L. Camardo.

At the conclusion of the hearing held on this matter on August 12, 2009, the Court took this matter

under advisement.  The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§

157(b)(2) and 1334(b).  Venue is proper pursuant to 28 U.S.C. § 1409(a).  This Memorandum

Opinion constitutes the Court's conclusions of law.

### I.  The Complaint and Answer

On December 31, 2008 (the "Petition Date"), Franklin Equipment Company (the "Debtor")

filed a petition for relief under Chapter 7 of Title 11 of the United States Code.  Roger Drake

("Drake") filed this adversary proceeding on March 10, 2009.  Drake's Complaint to Determine

Extent, Validity, and Priority of Lien ("Complaint") against the Debtor and Carolyn L. Camardo,

Chapter 7 Trustee (the "Trustee"), seeks to obtain declaratory judgment as to the extent, validity,

and priority of Drake's lien on a certain life insurance policy owned by the Debtor.

The Complaint alleges that on January 27, 2009, the Trustee filed a Motion to Sell Certain

Life Insurance Policies (the "Life Insurance Motion").  Through the Life Insurance Motion, the

Trustee sought and obtained authority to sell certain life insurance policies to Drake, including Life

Insurance policy number 7167287 issued by MetLife Company in the amount of $1.5 million on the

life of Drake (the "MetLife Policy").[1]  Complaint ¶ 8.  Drake alleges the MetLife Policy is subject

to a collateral assignment in favor of Drake (the "Drake Lien") to secure indebtedness owed to

Drake by the Debtor (the "Drake Claim").  *Id.* ¶ 9.  On February 19, 2009, this Court approved the

Life Insurance Motion.  Under the terms of the Life Insurance Motion, the purchase price of the

MetLife Policy was $325,000.00, which amount was to be paid at closing through a reduction of the

Drake Claim by $325,000.00.  *Id.* ¶¶ 10, 11.  Pursuant to the terms of the Life Insurance Motion and

the contract between Drake, as buyer, and the Trustee, as seller, Drake "credit bid" the purchase

price subject to a determination of the extent, validity, and priority of the Drake Lien, for which

purpose the Complaint was filed by Drake.  *Id.* ¶ 12.

With respect to the Drake Claim, Drake alleges that pursuant to a Line of Credit Note dated

April 23, 2008 (the "April 23, 2008 Note"),[2] Drake provided an $800,000.00 line of credit to the

Debtor.  *Id.* ¶ 13.  Drake further alleges the April 23, 2008 Note recites that it is secured by a first

priority security interest in the MetLife Policy as follows:

---

[1]  A copy of the MetLife Policy is attached as Exhibit A to the Complaint.

[2]  A copy of the April 23, 2008 Note is attached to the Complaint as Exhibit B.

> Collateral: This Note is secured by the following collateral and proceeds thereof (the "Collateral"):  A first priority security interest in, and collateral assignment of, that certain life insurance policy issued by METLIFE INSURANCE COMPANY OF CONNECTICUT (or other METLIFE COMPANIES, as applicable), bearing contract number 7167287 in the face amount of $1,500,000.

*Id.* ¶ 14 (quoting Exhibit B to Complaint).  Drake also alleges that in conjunction with the April 23, 2008 Note, the Debtor and Drake executed a Security Agreement of even date (the "Security Agreement"),[3] which grants Drake a security interest in the MetLife Policy:

> Security Interest.  Franklin grants Drake a first priority security interest in the following property and any and all additions, accessions and substitutions thereto or therefor and all proceeds therefrom (hereinafter referred to as the "Collateral"): That certain policy of life insurance issued by METLIFE INSURANCE COMPANY OF CONNECTICUT, policy number 7167287 in the face amount of $1,500,000.

> Secured Indebtedness.  The security interest granted to Drake under this Security Agreement constitutes continuing collateral security to secure the obligations and liabilities of Franklin to Drake pursuant to the Note and the loans evidenced thereby, whether now existing or hereafter incurred (collectively, the "Secured Obligations"), together with any and all costs, expenses, liabilities and attorney's fees now or hereafter chargeable to, or incurred by, or disbursed by Drake pursuant to this Security Agreement or to enforce payment of any of the Secured Obligations.

*Id.* ¶ 15 (quoting Exhibit C to Complaint).

Drake also alleges that, pursuant to the terms of the MetLife Policy, the Debtor executed a Collateral Assignment (the "Collateral Assignment") to assign its interest in the life insurance policy to Drake.[4]  According to Drake, on or about May 2, 2008, the Collateral Assignment was acknowledged by MetLife.[5]  *Id.* ¶ 16.

Drake additionally alleges that the Debtor drew from the line of credit throughout 2008 and,

---

[3]  A copy of the Security Agreement is attached to the Complaint as Exhibit C.

[4]  A copy of the Collateral Assignment is attached as Exhibit D to the Complaint.

[5]  A copy of the Acknowledgment is attached as Exhibit E to the Complaint.

3

with Drake's consent, overdrew the credit line.  The advances were memorialized by a series of

twenty-six promissory notes made payable to Drake (the "Twenty-Six Notes").  Drake asserts the

principal balance on the April 23, 2008 Note is $800,000.00 and that overdraws total $236,000.00,

for a total of $1,036,000.00.  Drake requests this Court enter an order declaring the Drake Claim to

be at least $800,000.00 and the Drake Lien to be a valid, enforceable, and perfected first lien against

the MetLife Policy and $800,000.00 of the proceeds thereof.

In her Answer, the Trustee largely neither admitted nor denied the material assertions of

Drake, contending she did not have sufficient facts to do so, and asserted a counterclaim ("Trustee's

Counterclaim") that challenges the allegations of Drake on the basis the indebtedness purportedly

secured by the MetLife Policy should be recharacterized by this Court as a capital contribution to

the Debtor by Drake.[6]  The Trustee asserts that, in addition to the security interest claimed in the

MetLife Policy, Drake, along with Drake Properties, LLC, is listed on Schedule D as having secured

claims in certain items of the Debtor's inventory in connection with "loans" made to the Debtor that

are reflected in over one hundred promissory notes made between September 20, 2005, and July 10,

2008 ("Floor Plan Notes").  The Trustee further asserts the Debtor allegedly executed a new Line

---

[6]  Drake and his sons, Wilson Drake and Randy Drake (collectively, "the Drakes"),
earlier filed a motion for relief from the automatic stay seeking an order granting relief as to the
real property constituting the former business premises of the Debtor and certain items of the
Debtor's personal property located within the Commonwealth of Virginia ("Motion for Relief").
The Trustee defended the Motion for Relief, in part, by asserting the indebtedness of the Drakes
that was the subject of the Motion for Relief should be recharacterized as capital contributions.
The Court granted relief to the Drakes and concluded there was no legal basis to recharacterize
the indebtedness of the Debtor at issue in the Motion for Relief as capital contributions.  The
indebtedness the Trustee argues should be recharacterized as a capital contribution here was not
at issue in the Motion for Relief.  *Drake v. Franklin Equip. Co.* (*In re Franklin Equip. Co.*), Case
No. 08-74473-SCS, 2009 WL 2983075 (Bankr. E.D. Va. Sept. 14, 2009) (slip opinion)
(hereinafter "*Franklin Equipment I*").

4

of Credit Note (the "May 2003 Note") in favor of Drake and his sons, Wilson Drake and Randy

Drake (collectively, the "Drakes"), and granted a security interest in the Debtor's property as part

of the assignment of a loan, which was earlier made to the Debtor by SunTrust Bank, to the Drakes

and the renewal of the same. The Trustee alleges the claimed security interests of the Drakes and

Drake Properties, LLC, as well as the claimed security interest of Drake in the MetLife Policy

should be considered as reflecting equity contributions rather than debt.[7]

## II. The Motion for Partial Summary Judgment

The Motion for Partial Summary Judgment of Drake ("Partial Summary Judgment Motion")

seeks the entry of a judgment establishing the "character" of the loan at issue and Drake's perfection

of his security interest in the MetLife Policy. Specifically, Drake believes he is entitled to judgment

as a matter of law that his lien on the MetLife Policy is valid, enforceable, and entitled to priority,

and that the claim secured by the lien on the MetLife Policy is properly characterized as debt.[8]

Initially supporting the Partial Summary Judgment Motion are three affidavits. The affidavit

of Drake ("Drake Affidavit") provides, in pertinent part, as follows:

1. Drake owns 24.36% of the Debtor's stock. Drake Affidavit ¶ 3.

2. Drake extended an $800,000.00 line of credit to the Debtor, memorialized by a Line of

---

[7] On April 13, 2009, the Trustee filed a motion to join Wilson Drake, Randy Drake, and
Drake Properties, LLC, in the above-captioned matter. A hearing was held on the Motion for
Joinder on May 28, 2009, at which time the Court denied the motion.

[8] Upon inquiry from the Court at the hearing on the Partial Summary Judgment Motion,
counsel for Drake advised the Partial Summary Judgment Motion had been labeled as such
because the Trustee's Counterclaim sought certain relief as to loans other than the loan allegedly
secured by the MetLife Policy. Counsel for Drake clarified that the instant motion sought to
conclude all controversies between the parties as to the loan allegedly secured by the MetLife
Policy and stated that the Partial Summary Judgment Motion, if granted, would constitute the
totality of the relief sought by Drake as to the MetLife Policy and any loan secured thereby.

5

Credit Note dated April 23, 2008, which contained a maturity date of May 1, 2009. *Id.* ¶¶ 5, 6.

3.  Drake required a security agreement from the Debtor, which granted Drake a security interest in the MetLife Policy.  *Id.* ¶ 7.

4.  The Debtor drew from the line of credit throughout 2008, memorializing the advances in a series of twenty-six notes made payable to Drake.[9] *Id.* ¶ 8.

5.  Drake intended, at the time he extended the line of credit to the Debtor and at all times thereafter, any advances made pursuant to the April 23, 2008 Note to be loans, and he expected full repayment of the advances from the Debtor's operating revenues, regardless of the profitability of the Debtor, or from liquidation of the MetLife Policy.  *Id.* ¶ 9.

6.  Drake expected the loan to be repaid with interest and has not subordinated his claim pursuant to the April 23, 2008 Note to any other indebtedness of the Debtor.  *Id.* ¶ 10.

7.  Drake directed the Debtor to liquidate the MetLife Policy to repay the loan in the autumn of 2008.  *Id.* ¶ 11.

The Partial Summary Judgment Motion is also supported by the affidavit of Wilson Drake. His affidavit ("Wilson Drake Affidavit") provides, in pertinent part, as follows:

1.  Wilson Drake is a Vice President of the Debtor and owns 22.19% of its outstanding stock. Randy Drake also owns 22.19% of the stock of the Debtor.  The remainder of the stock is owned by Roger Drake (24.36%) and six other individuals.  Wilson Drake Affidavit ¶¶ 2,3.

2.  Wilson Drake maintained the books and records of the Debtor.  *Id.* ¶ 4.

3.  In April 2008, Roger Drake extended an $800,000.00 Line of Credit to the Debtor

---

[9] Copies of the Twenty-Six Notes are attached as part of Exhibit 1 to Drake's Memorandum in Support of Motion for Partial Summary Judgment.

memorialized by a Line of Credit Note dated April 23, 2008, and contains the terms as set forth in

the Drake Affidavit.  Wilson Drake also sets forth the same assertions concerning the draws made

on the April 23, 2008 Note as made by Drake in the Drake Affidavit.  *Id*. ¶¶ 6, 7.

4.  The Debtor intended any advances under the April 23, 2008 Note to be loans for general

business purposes, and the advances were recorded as debt on the Debtor's ledger and books.  *Id*.

¶ 8.

5.  The outstanding balance as of the Petition Date of the Debtor exclusive of interest on the

April 23, 2008 Note was $1,036,000.00.  *Id*.  ¶ 9.

6.  The Debtor maintained interest calculations on the loans throughout 2008, but the Debtor

paid no interest on the April 23, 2008 Note because of its poor financial condition.  At the end of

2007, the Debtor showed paid in capital of $989,105.00 and retained earnings (loss) of

$8,222,329.00.  The 2007 revenues of the Debtor exceeded $12 million, and its gross profit was

$476,638.00, with an overall loss of $2.3 million.  Shareholder loans were approximately $9.2

million as of December 31, 2007.  *Id*. ¶ 10.

7.  As of the Petition Date of the Debtor, the balance due and owing to Drake pursuant to the

April 23, 2008 Note with interest was $1,073,600.70.  *Id*. ¶ 12.

The Partial Summary Judgment Motion is also supported by the affidavit of Randy Drake,

who is also a Vice President of the Debtor ("Randy Drake Affidavit").  Randy Drake reiterates the

assertions of the Drake Affidavit and the Wilson Drake Affidavit as to the making of the April 23,

2008 Note, the grant of a security interest in the MetLife Policy to secure the repayment of the April

23, 2008 Note, the execution by the Debtor of the Collateral Assignment assigning the MetLife

Policy to Drake, the receipt of which was acknowledged by MetLife on May 2, 2008, the intention

that the advances were loans, the recordation of the advances as debt, and the absence of any

knowledge of any agreement to subordinate the April 23, 2008 Note to any other indebtedness of

the Debtor. Randy Drake Affidavit ¶¶ 2-7.[10]

Based on the Affidavits, Drake contends there are no material facts in dispute and Drake has

a valid, first priority security interest in the MetLife Policy and that the loan secured thereby is in

fact a loan and may not be recharacterized as a capital contribution.

### III.  The Trustee's Objection to Partial Summary Judgment

The Trustee opposes the Partial Summary Judgment Motion.  In her Objection to Plaintiff's

Motion for Partial Summary Judgment ("Trustee's Objection"), the Trustee asserts Drake's

"mechanistic approach to recharacterization is not only inappropriate, but it is also inconsistent with

*Dornier*," believing that "because of the fact intensive analysis required by *Dornier*, the

recharacterization inquiry is not susceptible to resolution through the summary judgment process."

Trustee's Objection, at 3.  The Trustee also argues that "[e]ven assuming that [the] summary

judgment process is appropriate, however, the documentary and testimonial evidence obtained by

the Trustee in the bankruptcy case show that genuine issues of material fact exist with respect to the

factors to be considered in the recharacterization analysis." *Id.* at 3-4.  In support of her contentions,

the Trustee relies upon a number of deposition excerpts; a memorandum prepared by Willcox &

Savage, counsel to the Debtor at the time; guaranties supplied to SunTrust Bank; internal SunTrust

communications for a loan unrelated to the transaction at issue; and copies of the Twenty-Six Notes

and checks representing the funding of the Twenty-Six Notes, all of which are appended to the

---

[10]  The Drake Affidavit, the Wilson Drake Affidavit, and the Randy Drake Affidavit are sometimes collectively referred to as the "Affidavits."

Trustee's Objection.[11]  The Trustee did not respond with any affidavits.

The Trustee summarizes her defenses as follows:

When the transactions are viewed in their totality, coupled with the documentary and testimony evidence, it is clear that the Drakes were acting to protect their investment interest in the Debtor.  None of the "loan" transactions appear to have been the result of arms length negotiations.  Rather, it appears that back in 1999, the Debtor was entering into the zone of insolvency.  Struggling with the demands of its major lender, SunTrust, the Debtor attempted to relieve the pressure with various concessions to the bank.  But finally reaching the end point, the Debtor was on the verge of collapse with no other buyer or non-insider financial institution willing to assume the risky investment.  The Drakes, already being personal guarantors, had little to lose by purchasing the SunTrust loan and everything to gain.  Without their purchase, they would have most likely had to shut the Debtor down, thereby losing their investment interest, and having to honor their personal guarantees to SunTrust.  After the purchase, the Drakes continued to invest more money into the Debtor.  Although they termed labeled [sic] these transactions as "loans," they did not treat them as loans.  Nor did their actions show that they considered them loans.  They allowed the Debtor to default, admitting that they did not expect payments until the Debtor became profitable.  They also disregarded the terms of the "loan" documents, as in the case of the floor plan notes, where equipment allegedly securing the notes was sold but the proceeds never remitted to pay off the notes.  They further continued to invest money even after it became clear that the Debtor could not, and would not be able, to pay either on the old "loans" or on the new "loans."  All of these facts show that the Drakes, including the Plaintiff, acted and were acting as classic capital investors hoping to be paid out of future profits of the Debtor.  That is even all more apparent when the $800,000 April 23, 2008 Line of Credit Note was executed.

Id. at 14-15.  The Trustee also believes that "[e]ven if the Court were to reject the Trustee's recharacterization theory, the admissions that Plaintiff makes in his complaint and the documents he attaches thereto establish that no loans were made under the April 23 Note, but rather under the 26 Promissory Notes. . . ."  Id. at 15.

---

[11]  The deposition excerpts are summarized in the Trustee's Objection at pages 7-12.  The deposition excerpts focus largely on the Debtor's financial condition beginning in 1999, the Debtor's interactions with SunTrust Bank, and other loans, unrelated to the alleged loan at issue in the instant matter, made to the Debtor by the Drakes.

The Trustee contends that "[t]he documents provided by Plaintiff show no relationship between the April 23, 2008 Line of Credit Note, the associated Security Agreement . . . and the 26 Promissory Notes." *Id*. at 16. The Trustee specifically looks to the Twenty-Six Notes exhibited by Drake as supporting her assertion these notes are not secured by the MetLife Policy:

> [A] review of the documents shows that the April 23, 2008 Line of Credit Note and the 26 Promissory Notes were unrelated transactions. The April 23, 2008 Line of Credit Note has different repayment terms, default provisions, and interest rates from those contained in the 26 Promissory Notes. Several of the 26 Promissory Notes were executed, and advances under them extended, prior to the date of the creation of the April 23, 2008 Line of Credit Note. Indeed, Plaintiff provided documents showing that a total of $1,036,000 was advanced under the 26 Promissory Notes. However, prior to April 23, 2008, the monies advanced totaled $575,000. See Exhibit "W." None of the Notes refer to the April 23, 2008 Credit Line Note or include language that they are secured by any collateral whatsoever. Nor is there evidence in the documents that any obligations, other than those incurred by Debtor under the April 23, 2008 Line of Credit Note, were intended to be secured by the MetLife Policy. Indeed, the Security Agreement executed in connection with the April 23, 2008 Credit Line Note contains a provision entitled "Secured Indebtedness," which describes the specific obligations to be secured by the MetLife Policy:

>> to secure the obligations and liabilities of Franklin to Drake pursuant to the Note and the loans evidenced thereby, whether now existing or hereinafter incurred (collectively, the "Secured Obligations"), together with any and all costs, expenses, liabilities and attorney's fees now or hereinafter chargeable to, or incurred by, or disbursed by Drake pursuant to this Security Agreement or to enforce payment of any of the Secured Obligations.

> The Security Agreement represents clear and irrefutable evidence of the Debtor's intent that only obligations incurred under the April 23, 2008 Line of Credit Note would be secured by the MetLife Policy. Here, as Plaintiff admits, the loans were advanced under the 26 Promissory Notes and attaches the 26 Promissory Notes to his complaint. The 26 Promissory Notes make no mention of a security interest in any collateral; have completely different terms and conditions than those contained in the April 23, 2008 Line of Credit Note; and were not intended to be secured by the MetLife Policy based on the clear language of the Security Agreement executed in connection with the April 23, 2008 Line of Credit Note.

*Id*. at 16-17.

IV.  The Trustee's Motion to Amend Counterclaim

On June 22, 2009, the Trustee moved to amend her Counterclaim, praying for leave to add a second count that challenges the security interest of Drake vis-à-vis the MetLife Policy ("Motion to Amend").  The Trustee asserted that "[t]he second count offers an alternative theory of recovery that challenges Drake's secured claim based on the plain language of the security agreement attached to Drake's complaint and the facts alleged in the complaint."  Motion to Amend, at 1. Additionally, the Trustee sought to add a third count to require Drake to provide a detailed accounting of all loans he made to the Debtor, including repayments, application of the repayments to specific loans, and related transactions.  The Court conducted a hearing on the Motion to Amend on July 16, 2009, and deemed Counts I and II of the proposed amended counterclaim to be in the nature of affirmative defenses and permitted their assertion as such in this proceeding.  The Court denied the Motion to Amend with respect to proposed Count III of the proposed amended counterclaim.[12]

V.  The Supplemental Memorandum and Affidavit and the Trustee's Objection

In support of the Supplemental Memorandum in Support of Partial Summary Judgment ("Drake Supplemental Memorandum"), Wilson Drake filed a supplemental affidavit ("Supplemental Affidavit").  The Supplemental Affidavit provides additional factual assertions as to the funding of the MetLife Loan:

1.  Roger Drake extended a line of credit in the amount of $800,000.00 to the Debtor in January 2008, which the Debtor considered to be a loan and booked it as such on the company's

---

[12]  The Court also granted leave to Drake and the Trustee to file supplemental memoranda respectively to address the new defense asserted in Count II of the amended counterclaim.

11

records.  Roger Drake expected the line of credit to be secured by a lien on the MetLife Policy.

Supplemental Affidavit ¶ 3.

2.  Roger Drake funded the line of credit through twenty-six advances.  *Id*. ¶ 4.

3.  Wilson Drake states "[w]ith each advance made pursuant to the line of credit, for purposes

of documentation and a 'paper trail,' I signed a promissory note on behalf of the Company and I

booked the amount advanced into an account in the Company's general ledger identified as

'Account 1-250-311.'  Each promissory note has a handwritten or typed reference to 'Acct 1-250-

311' for purposes of identifying the advance to the loan account.  Roger Drake confirmed each

advance under the line of credit, shown by his signature on each promissory note."  *Id*. ¶ 5.

4.  Wilson Drake kept a file of the promissory notes and copies of Roger Drake's checks or

other evidence of the advances under the line of credit, most of which also contain a reference to

"Acct 1-250-311."  *Id*. ¶ 6.

5.  The Debtor and Roger Drake neglected to document the assignment of the MetLife Policy

until April 23, 2008.  The Debtor continued to execute the individual promissory notes with each

advance, and each advance was booked to the same account on the general ledger of the Debtor.

*Id*. ¶ 7.

6.  Roger Drake and the Debtor agreed in the course of dealings to modify the line of credit

to increase the $800,000.00 limit.  Commencing in January 2008 and at all times thereafter, the

Debtor considered the ongoing advances pursuant to the line of credit to be secured by the MetLife

Policy.  *Id*. ¶ 8.

7.  No interest was paid to Roger Drake because of the poor cash flow situation of the

Debtor.  *Id*. ¶ 10.

8.    Advances by Roger Drake on the line of credit prior to April 23, 2008, totaled $625,000.00, and on or after April 23, 2008, "Roger Drake lent the Company a total of $411,000 in the form of new cash advances evidenced by the individual promissory notes, checks from Roger Drake, and entries to Account 1-250-311." *Id.* ¶ 11.

9.    According to MetLife Insurance Company, the cash value of the MetLife Policy at the end of March 2008 was $7,736.79. *Id.* ¶ 12.

Accordingly, Drake asserts that "the twenty-six (26) individual promissory notes were intended to memorialize advances under the MetLife Loan and create a 'paper trail.'" Drake Supplemental Memorandum, at 5. Drake argues the Security Agreement does not limit the obligations secured by the MetLife Policy to obligations memorialized in any particular fashion and that the definition of the "Secured Obligations" includes the obligations of the Debtor to Drake pursuant to the April 23, 2008 Note "and the loans evidenced thereby." *Id.* According to Drake, the rate at which interest was recorded on the April 23, 2008 Note was the prime rate at the time of commencement of the line of credit rather than the various rates set forth in the Twenty-Six Notes. The Twenty-Six Notes also advance the maturity date, a factor which Drake asserts the Debtor did not protest. *Id*. at 6. Drake admits the original amount of the line of credit of $800,000.00 was exceeded but asserts this is of no moment because the later advances had exceeded the value of his collateral of the MetLife Policy. *Id*. at 7. Finally, Drake argues that since these modifications were for the benefit of the Debtor, the Trustee therefore has no standing to object to these modifications or to assert them as defenses on behalf of the Debtor. *Id*. at 6.

The Trustee's Response to the Plaintiff's Supplemental Memorandum in Support of Partial Summary Judgment ("Trustee's Supplemental Memorandum") argues:

13

Plaintiff argues that he intended for the loans under the twenty (26) Promissory
Notes (the "Promissory Notes") to be considered advances under the April 23, 2008
Line of Credit Note ("April 23 Note") and therefore secured by the MetLife Policy.
Plaintiff claims that this intent is evidenced by the fact that "Debtor booked each
advance into the Debtor's general ledger under an account identified as "Acct 1-250-
311."  He further claims that "[e]ach promissory note has a handwritten or typed
reference to "Acct 1-250-311" and, by countersigning the instrument, memorializes
Mr. Drake's agreement to advance under the account."  Plaintiff insists that it is a
"facially absurd argument" to suggest that Plaintiff would have "intended to make
twenty-six separate unsecured loans and forego the benefits of a secured line of
credit."  Plaintiff also argues that it would be a "pure windfall" if the loans under the
Promissory Notes were not considered advances under the Line of Credit.  None of
these arguments is compelling when one considers the documents at issue. The latter
argument, that the estate would receive a "pure windfall," has no merit.  The
Promissory Notes and the Line of Credit Note were all drafted by either the Plaintiff
or his legal representatives.  He must bear the consequences of the documents that
he drafted, especially when they are clear and unambiguous on their face.
Furthermore, unless the Plaintiff can point to some ambiguity identified in those
documents, he is barred by the parole [*sic*]September 29, 2009 evidence rule from
attempting to introduce any extrinsic evidence to alter, modify or change the terms
and conditions explicitly stated in those documents.

Trustee's Supplemental Memorandum, at 1-2.  The Trustee further asserts that even if parol

evidence is considered at this stage of the proceedings, Drake's intent cannot be determined by way

of summary judgment due to the factual nature of the inquiry.  *Id.* at 8-9.  The Trustee also argues

that "[s]ince no loans were extended under the [April 23, 2008] Note, the Collateral Assignment of

the MetLife Policy, which was intended to secure loans under the April 23 Note, is avoidable under

fraudulent conveyance law, pursuant to Sections 548 and 544."  *Id.* at 9.[13]

On August 5, 2009, the Trustee filed a Cross Motion for Summary Judgment, contending the

_____

[13]  Drake in his Supplemental Memorandum attempted to anticipate and refute an
argument by the Trustee that Drake's lien on the MetLife Policy was subject to avoidance by the
Trustee under 11 U.S.C. § 547 as a preference.  The Trustee instead argues that Drake's lien can
be set aside as a fraudulent conveyance pursuant to 11 U.S.C. §§ 544 and 548.  No adversary
proceeding under these avoidance sections has been initiated by the Trustee against Drake nor
has the Trustee asserted such contentions in her Counterclaim in this adversary proceeding.  *See*
fn. 20, *infra*.

Trustee is entitled to the entry of summary judgment because the undisputed facts establish the April 23, 2008 Note was not funded. The Cross Motion for Summary Judgment has not as yet been argued.[14]

### VI. The Standard for Adjudication of a Motion for Summary Judgment

The Fourth Circuit Court of Appeals has articulated the standards by which this Court must measure a motion for summary judgment:

> Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Where a case is "decided on summary judgment, there have not yet been factual findings by a judge or jury, and [the appellant's] version of events . . . differs substantially from [the appellee's,] . . . courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the . . . motion." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007) (internal quotation marks and alterations omitted).

> However, "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Id*. at 1776 (quoting Fed. R. Civ. P. 56(c)). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

*Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 332 (4th Cir. 2009). Judge Pearson has succinctly summarized the respective burdens of the parties in a summary judgment context:

> The moving party has the initial burden of proving that no genuine issue of fact

---

[14] On August 5, 2009, the Trustee also filed a motion to postpone the hearing on Drake's Motion for Partial Summary Judgment and conduct argument on the Drake Motion for Partial Summary Judgment at the same time as the oral argument on the Trustee's Cross Motion for Summary Judgment. The motion to postpone was denied by the Court on August 12, 2009.

exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265
(1986).  The burden then shifts to the nonmoving party to demonstrate that a triable
issue of fact exists which precludes summary judgment against the nonmovant.
*Holland v. Double G. Coal Co.*, 898 F. Supp. 351 (S.D. W. Va. 1995).

*Equicredit Corp. v. Simms* (*In re Simms*), 300 B.R. 877, 879 (Bankr. S.D. W. Va. 2003).  To defeat

a motion for summary judgment, the nonmoving party must go beyond the pleadings with affidavits,

depositions, interrogatories, or other evidence to show that there is a genuine issue for trial.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The threshold for materiality of facts to invoke a

genuine dispute has been defined by Judge Anderson:

> Those facts which are "material" for purposes of summary judgment are identified
> by the substantive law of the claim asserted.  In other words, only disputes over facts
> that might affect the outcome of the suit under the governing law will properly
> preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
> 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  An issue is "genuine" if the evidence
> is such that a reasonable jury could return a verdict for the non-moving party.  *Id.*

*Hampton v. Conso Prods, Inc.*, 808 F. Supp. 1227, 1232 (D.S.C. 1992).

Once a summary judgment motion is filed, Rule 56(e)(2) of the Federal Rules of Civil

Procedure, as incorporated in bankruptcy proceedings by Rule 7056 of the Federal Rules of

Bankruptcy Procedure, provides the duties of the opposing party:

> When a motion for summary judgment is properly made and supported, an opposing
> party may not rely merely on allegations or denials in its own pleading; rather, its
> response must—by affidavits or as otherwise provided in this rule—set out specific
> facts showing a genuine issue for trial.  If the opposing party does not so respond,
> summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2).  In considering a motion for summary judgment, "it remains the well

established rule that 'the judge's function is not himself to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial.'"  *Moore v. Morton*,

16

No. 91-2603, 1992 WL 46292, at *4 (4th Cir. Apr. 2, 1992) (unpublished table decision) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "Further, 'the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Id.* (citing *Liberty Lobby*, 477 U.S. at 248-49).

## VII.

### A. The Defense of Recharacterization According to *Dornier*

The Trustee argues that the April 23, 2008 Note should be recharacterized as an equity contribution by Drake to the Debtor and therefore the April 23, 2008 Note is not a valid indebtedness of the Debtor. As this Court explored extensively in *Franklin Equipment I*, recharacterization of debt as equity was considered by the Fourth Circuit Court of Appeals as a matter of first impression in *In re Official Committee of Unsecured Creditors for Dornier Aviation (North America), Inc.*, 453 F.3d 225 (4th Cir. 2006) (hereinafter "*Dornier*"). Concluding that recharacterization was a remedy available to the Bankruptcy Court, the Court wrote:

> In our view, recharacterization is well within the broad powers afforded a bankruptcy court in § 105(a) and facilitates the application of the priority scheme laid out in § 726. The Code establishes a system in which contributions to capital receive a lower priority than loans because "the essential nature of a capital interest is a fund contributed to meet the obligations of a business and which is to be repaid only after all other obligations have been satisfied." *See Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 630 (Bankr. N.D. Fla. 1990) (quoting Asa S. Herzog & Joel B. Zweibel, *The Equitable Subordination of Claims in Bankruptcy*, 15 Vand. L. Rev. 83, 94 (1961)). Thus, implementation of the Code's priority scheme requires a determination of whether a particular obligation is debt or equity. Where, as here, the question is in dispute, the bankruptcy court must have the authority to make this determination in order to preserve the Code's priority scheme. If the court were required to accept the representations of the claimant, as GMBH appears to argue, then an equity investor

17

could label its contribution a loan and guarantee itself higher priority—and a larger
recovery—should the debtor file for bankruptcy.  Thus, denying a bankruptcy court
the ability to recharacterize a claim would have the effect of subverting the Code's
critical priority system by allowing equity investors to jump the line and reduce the
recovery of true creditors.  In light of the broad language of § 105(a) and the larger
purpose of the Bankruptcy Code, we believe that a bankruptcy court's power to
recharacterize is essential to the proper and consistent application of the Code.

*Dornier*, 453 F.3d at 231.  In endorsing the availability of recharacterization in the bankruptcy court,

the Fourth Circuit Court of Appeals also strongly cautioned as to the necessity of distinguishing the

more familiar remedy of equitable subordination:

Like disallowance, equitable subordination also differs markedly and serves different
purposes from recharacterization.  While a bankruptcy court's recharacterization
decision rests on the substance of the transaction giving rise to the claimant's
demand, its equitable subordination decision rests on its assessment of the creditor's
behavior.   As the Tenth Circuit has explained, when a claim is equitably
subordinated, "[t]he funds in question are still considered outstanding corporate debt,
but the courts seek to remedy some inequity or unfairness perpetrated against the
bankrupt entity's other creditors or investors by postponing the subordinated
creditor's right to repayment until others' claims have been satisfied."  *Sender v.
Bronze Group, Ltd.* (*In re Hedged-Invs. Assocs., Inc.*), 380 F.3d 1292, 1297 (10th
Cir. 2004); *see also id.* ("The doctrine of equitable subordination, by contrast, looks
not to the substance of the transaction but to the behavior of the parties involved.").
Thus, although recharacterization and equitable subordination lead to a similar result,
they "address distinct concerns" and require a bankruptcy court to conduct different
inquiries.  *See Cohen v. KB Mezzanine Fund II, LP* (*In re SubMicron Sys. Corp.*),
432 F.3d 448, 454 (3d Cir. 2006).

*Id.* at 232-33.

The Sixth Circuit Court of Appeals also notes the important distinction in remedy between

equitable subordination and recharacterization:

The effect of a bankruptcy[] court's recharacterization of a claim from debt to equity
may be similar to the court's subordination of a claim through equitable
subordination in that, in both cases, the claim is subordinated below that of other
creditors.  However, there are important differences between a court's analysis of
recharacterization and equitable subordination issues.  Not only do recharacterization

and equitable subordination serve different functions, but the extent to which a claim is subordinated under each process may be different. . . . Recharacterization cases "turn on whether a debt actually exists, not on whether the claim should be equitably subordinated." In a recharacterization analysis, if the court determines that the advance of money is equity and not debt, the claim is recharacterized and the effect is subordination of the claim "as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation." In an equitable subordination analysis, the court is reviewing whether a legitimate creditor engaged in inequitable conduct, in which case the remedy is subordination of the creditor's claim "to that of another creditor only to the extent necessary to offset injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective."

*Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 748-49 (6th Cir. 2001) (internal citations omitted) (hereinafter "*AutoStyle*"). As Judge Waites has succinctly reminded, "reclassification is substantially different from subordination in that subordination focuses on the creditor's behavior; whereas, reclassification rests on the substance of the transaction giving rise to the claim." *Vieira v. AGM II, LLC* (*In re Worldwide Wholesale Lumber, Inc.*), 372 B.R. 796, 811 (Bankr. D.S.C. 2007).[15] Accordingly, when recharacterization is asserted as a remedy "[r]ather

---

[15] As Judge Mitchell of this Court has noted:

As a practical matter, recharacterization of a debt as equity achieves essentially the same result as equitable subordination, since equity receives distributions in bankruptcy only after creditors have been paid in full. *Cohen v. KB Mezzanine Fund II, L.P.* (*In re SubMicron Sys. Corp.*), 291 B.R. 314, 322 (D. Del. 2003). However, recharacterization proceeds from a different premise. Equitable subordination, as noted, focuses on the creditor's conduct vis-a-vis the debtor or other creditors. By contrast, "[w]hen a putative loan to a corporation is recharacterized, the courts effectively ignore the label attached to the transaction at issue and instead recognize its true substance." *In re Hedged-Invs. Assocs., Inc.*, 380 F.3d 1292, 1297 (10th Cir. 2004) (emphasis added). As a result, "[t]he funds advanced are no longer considered a loan which must be repaid in bankruptcy proceedings as corporate debt, but are instead treated as a capital contribution." *Id.*

*Wilson v. Moir* (*In re Wilson*), 359 B.R. 123, 140 (Bankr. E.D. Va. 2006).

19

than recharacterizing the exchange from debt to equity, or subordinating the claim for some reason, the question before this Court is whether the transaction created a debt or equity relationship from the outset." *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) (hereinafter "*Cold Harbor*").[16]

*Dornier*, relying upon *AutoStyle*, provides the factors a court may consider in determining whether it should recharacterize a claim:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. These factors all speak to whether the transaction "appears to reflect the characteristics of . . . an arm's length negotiation." This test is a highly fact-dependent inquiry that will vary in application from case to case.

*Dornier*, 453 F.3d at 233-34 (quoting *AutoStyle*, 269 F.3d at 749-50). Despite the comprehensive list of factors to be considered by a court in adjudicating a claim of recharacterization, *Dornier* warns that "[n]one of these factors is dispositive and their significance may vary depending upon circumstances," *id.* at 234 (quoting *Sender v. Bronze Group, Ltd.* (*In re Hedged-Invs. Assocs., Inc.*), 380 F.3d 1292, 1298-99 (10th Cir. 2004)), and "no mechanistic scorecard suffices." *Id.* (quoting

---

[16] "Some of the confusion between the doctrines is caused by the fact that undercapitalization is a factor in the equitable subordination analysis and often is a factor in a recharacterization analysis, leading 'some courts to equitably subordinate claims that other courts would recharacterize as equity contributions.'" *AutoStyle*, 269 F.3d at 749 (citing Matthew Nozemack, Note, *Making Sense Out of Bankruptcy Courts' Recharacterization of Claims: Why Not Use § 501(c) Equitable Subordination?*, 56 WASH. & LEE L. REV. 689, 717 (1999)).

20

*Cohen v. KB Mezzanine Fund II, LP* (*In re SubMicron Sys. Corp.*), 432 F.3d 448, 456 (3d Cir. 2006)).   The Fourth Circuit specifically admonishes that the insider status of a creditor and undercapitalization alone are insufficient to invoke this dramatic remedy:

> We think it important to note that a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim.  In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans.  However, when other factors indicate that the transaction is not a loan at all, recharacterization is appropriate to ensure the consistent application of the Bankruptcy Code.

*Id.*  Judge Shelley, in a decision prior to *Dornier*, well summarized the thematic concerns of the various factors contemplated by other courts in evaluating whether exercise of the remedy of recharacterization is appropriate:

> A reading of the two lists of factors together highlights a few main themes that demarcate the distinction between loans and equity contributions in these situations. A critical group of factors concern the formality of the alleged loan agreement.  The more specific and complete the parties are in identifying and codifying the terms of the alleged loan agreement, the more like a loan the transaction appears.  By contrast, if the terms of such an agreement are vague and non-specific, such a transaction appears more like a shareholder contributing capital to keep his investment afloat. A second important group of factors relate to the financial situation of the corporation at the time the purported loan is made.  If investing in the corporation appears to have been especially risky (e.g. it was thinly capitalized), or the source of funds to repay the loan is not made clear, then the transaction has more of the earmarks of an equity contribution.  An additional group of factor in this category is the relationship between the limited partners equity ownership and the parties' participating in the making of the loan, reflected by the concern over whether there is identity between the equity holders and the alleged lenders, and whether control of the corporation is dependent upon the loan in question.

*Cold Harbor*, 204 B.R. at 916.

Applying these principles to the evidence adduced in the bankruptcy court, the Fourth Circuit Court of Appeals supported the conclusion that recharacterization was appropriate:

21

The court determined that, while some aspects of the transaction were consistent with a loan, the transaction on the whole was more consistent with a capital contribution. The court found particularly significant (1) GMBH's insider status, (2) "the lack of a fixed maturity date" for the purported loan, (3) the fact that [Dornier] would not be required to pay until it became profitable, (4) [Dornier's] "long history of unprofitability and the fact that its liabilities after the corporate restructuring far exceeded its assets," and (5) GMBH's assumption of [Dornier's] losses. We believe that these facts adequately support the bankruptcy court's recharacterization decision here.

*Dornier*, 453 F.3d at 234.

In connection with the recharacterization defense of the Trustee, the Drake Affidavit, the Wilson Drake Affidavit, the Randy Drake Affidavit, the Supplemental Affidavit, and an examination of the April 23, 2008 Note address many of the factors set forth in *Dornier*. It remains to examine the state of the record before the Court at this juncture to determine if there is a material factual dispute concerning this defense and whether Drake is entitled to judgment on the defense of recharacterization as a matter of law.

## B. An Examination of the *Dornier Factors* with Respect to the Affidavits and the Trustee's Objection

### 1. The Name Given to the Instrument Evidencing the Indebtedness

"The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans." *AutoStyle*, 269 F.3d at 750 (citing *Roth Steel Tube Co. v. Comm'r of Internal Revenue*, 800 F.2d 625, 631 (6th Cir. 1986) (hereinafter "*Roth Steel*")). The April 23, 2008 Note is plainly labeled as a debt instrument and contains terms and conditions consistent with those typically found in commercial debt instruments. The Twenty-Six Notes, to the extent they may actually evidence the advances made by Drake, also are plainly labeled as notes. Drake Affidavit ¶ 5; Memorandum in Support of Motion for Partial Summary Judgment,

22

Exhibit 1. There is nothing asserted by the Trustee in the Trustee's Objection or otherwise to contradict this factual conclusion.

2. The Presence or Absence of a Fixed Maturity Date and Schedule of Payments

"The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans." *AutoStyle*, 269 F.3d at 750 (citing *Roth Steel*, 800 F.2d at 631). The April 23, 2008 Note provides "[t]his Note shall be payable without demand on May 1, 2009" for the total principal amount advanced plus accrued interest and any other amounts due. *See* April 23, 2008 Note. The April 23, 2008 Note also provides for interest at the prime rate of interest as published in the *Wall Street Journal* plus one and one-half percent, with such accrued interest being payable monthly. *Id.*; *see also* Drake Affidavit ¶ 6. While some reviewing courts have expressed the notion that an absence of required principal curtailments in an instrument may weigh towards an indicia of equity, this Court concurs with the assessment of the Sixth Circuit Court of Appeals in *AutoStyle*:

> The bankruptcy court noted that the absence of a set schedule of repayment of principal weighs in favor of equity, but is not dispositive. The district court, however, noted that the participation agreements used demand notes as well as a fixed rate of interest and regular interest payments, which it believed was indicative of a loan. Moreover, the district court stated that rigid application of a rule that the lack of a fixed maturity date and fixed repayment schedule was indicative of equity "would create a per se rule that use of a demand note by an insider would always be indicative of an equity contribution rather than a loan." We agree and therefore conclude that the use of demand notes along with a fixed rate of interest and interest payments is more indicative of debt than equity.

*AutoStyle*, 269 F.3d at 750. Here the provisions of the April 23, 2008 Note weigh towards the conclusion it was originated as debt.

3. The Presence or Absence of a Fixed Rate of Interest and Interest Payments

23

"The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans." *Id.* (citing *Roth Steel*, 800 F.2d at 631). The April 23, 2008 Note contains a fixed interest rate and fixed payments of interest. The Trustee asserts the failure of the Debtor to make payment of interest on the April 23, 2008 Note and of Drake to enforce the default provisions of the April 23, 2008 Note is evidence that this instrument was, in fact, intended to be equity. A similar argument was rejected in *AutoStyle*:

> The defendants were to be paid at 2% over the prime rate "as [CIT] is paid by [AutoStyle]." The defendants subsequently agreed to defer interest payments. At best, Bayer can argue that this factor cuts both ways since the deferral of interest payments indicates the possibility that during the course of the transaction the defendants eventually never expected to get repaid and converted their debt to equity. Still, it does not change the fact that, initially at least, there was a fixed rate of interest and interest payments, indicating that the transaction was originally intended to be debt not equity. Moreover, the deferral of interest payments does not by itself mean that the parties converted a debt transaction to equity since the defendants still expected to be repaid.

*Id.* at 750-51 (citing *Cold Harbor*, 204 B.R. at 915 (noting that recharacterization applies to transactions that were equity contributions "ab initio")). Drake has affirmed that he did not abandon his intention to ultimately be repaid the amounts advanced by him under the April 23, 2008 Note, which is uncontradicted. To this end, he states in his affidavit that he directed the Debtor to liquidate the MetLife Policy in the autumn of 2008 to be repaid the loan amount, which efforts the company undertook. Drake Affidavit ¶ 11. The danger of imputing recharacterization implications to a creditor's election to forebear from collection efforts was well recognized by Judge Schmetterer:

> Debtor's argument seems to be that a creditor's agreement to forbear until Debtor is in position to pay will result in recharacterization of secured or unsecured debt to equity. It can hardly be argued that forbearance in the face of financial stress by itself supports a finding of recharacterization. Forbearance until a debtor's cash flow improves may be good judgment to keep a loan out of bankruptcy court, and that is all to be concluded from [the creditor]'s forbearance for a time in connection with

24

> [Debtor]'s debt.  Moreover, forbearance came after all the loans were made under
> commercially common terms and documentation.  If such forbearance could
> retroactively convert a good loan to equity, that would indeed validate the saying that
> "no good deed goes unpunished."

*Repository Techs., Inc. v. Nelson* (*In re Repository Techs., Inc.*), 363 B.R. 868, 883 (Bankr. N.D.

Ill. 2007).  The forbearance of Drake from exercising his rights to declare the April 23, 2008 Note

in default or to exercise his collection remedies thereunder until the autumn of 2008 are insufficient

to persuade the Court that the evidence under this factor strongly points to a conclusion that the

April 23, 2008 Note is and was intended to be debt.

### 4.   The Source of Repayments

"If the expectation of repayment depends solely on the success of the borrower's business,

the transaction has the appearance of a capital contribution." *AutoStyle*, 269 F.3d at 751 (citing *Roth*

*Steel*, 800 F.3d at 631).  The April 23, 2008 Note was intended to be paid from the cash flow of the

Debtor.  Additionally, however, Drake received a first priority lien upon the MetLife Policy.  These

circumstances were considered in *AutoStyle*:

> The bankruptcy court noted that the source of repayment of the defendants'
> participation interests in the CIT credit facility is identical to the source looked to by
> CIT for repayment of its portion of the credit facility: AutoStyle's earnings, secured
> by a lien on all of AutoStyle's assets.  We agree with the district court that these facts
> weigh only slightly in favor of equity.  The fact that CIT and the defendants were to
> be paid out of AutoStyle's earnings indicates that they were dependent on the
> success of AutoStyle's business, however, this is balanced to some extent by the
> security of the lien on all of AutoStyle's assets.

*Id.*  Here this factor weighs toward a conclusion the April 23, 2008 Note constitutes debt.  Had the

April 23, 2008 Note been payable only from profits of the Debtor, it would in that respect resemble

a dividend and be an indicia of a capital contribution.  The repayment of the April 23, 2008 Note

25

was, and is, secured by a lien on the MetLife Policy, and, while doubtless originally intended to be
an alternative source of repayment, nonetheless now is the only source of repayment. *See In re
Blevins Concession Supply Co.*, 213 B.R. 185, 188 (Bankr. M.D. Fla. 1997) ("In the instant case,
a Convertible Subordinated Promissory Note . . . in the principal amount of $1,500,000.00 was
executed by the President of the Debtor on April 4, 1995.  The Note provided for periodic interest
payments to be made by the Debtor and that the unpaid principal balance, together with all accrued,
unpaid interest was due and payable in full on September 30, 1996.  Clearly, the repayment of the
advance was not tied to the 'fortunes of the business' and, therefore, the repayment terms of the Note
are indicative of a loan and not a capital contribution.").  All loans to a commercial borrower are
initiated with the expectation they will be repaid from the earnings of the borrower, with the
collateral securing the loan serving as a secondary source of repayment should earnings be
insufficient to regularly pay the indebtedness.  Even if the Debtor could only repay the April 23,
2008 Note by surrendering the collateral does not mean the April 23, 2008 Note was not a loan. *In
re Airadigm Commc's, Inc.*, 376 B.R. 903, 909 (Bankr. W.D. Wis. 2007) ("The fact that [the Debtor]
could only repay the loans by surrendering the collateral does not mean they were not loans.").  In
this regard, the April 23, 2008 Note resembles a typical commercial loan, and this factor weighs
toward a conclusion the April 23, 2008 Note was initiated as debt and not as a capital contribution.

### 5.  The Adequacy or Inadequacy of Capitalization

"Thin or inadequate capitalization is strong evidence that the advances are capital
contributions rather than loans." *AutoStyle*, 269 F.3d at 751 (citing *Roth Steel*, 800 F.2d at 630).
However, even the existence of undercapitalization alone is not sufficient to invoke
recharacterization. *Official Comm. of Unsecured Creditors v. Foss* (*In re Felt Mfg. Co.*), 371 B.R.

589, 630 (Bankr. D.N.H. 2007). "Undercapitalization is a poorly-defined phrase, and especially so in the context of bankruptcy." *In re Lifschultz Fast Freight*, 132 F.3d 339, 343 (7th Cir. 1997). *See Mach. Rental, Inc. v. Herpel* (*In re Multiponics, Inc.*), 622 F.2d 709, 717 (5th Cir. 1980) ("[T]he concept of undercapitalization has never been precisely defined."). This Court reviewed the analysis of inadequate capitalization by other courts in *Franklin Equipment I* at *23-26. In the context of an equitable subordination claim, the Seventh Circuit Court of Appeals has provided a reasoned test of the adequacy of capitalization:

> A firm is adequately capitalized for purposes of equitable subordination if its equity capital equals or exceeds "what reasonably prudent men with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of incorporation of the now defunct enterprise." *Mobile Steel*, 563 F.2d at 703 (citing N. Lattin, THE LAW OF CORPORATIONS §§ 15, 77 (1971)).

> To put this rule of reason into practical form, the approach finding the most favor is the two-pronged test enunciated in *Mobile Steel*. This test takes its cue from observable, formal changes in the firm's capital structure. The first prong looks to the moment of initial capitalization of the firm. Undercapitalization exists at inception "if, in the opinion of a skilled financial analyst, [the capitalization] would definitely be insufficient to support a business of the size and nature of the [debtor] in light of the circumstances existing at the time the bankrupt was capitalized." *Mobile Steel*, 563 F.2d at 703. The second prong looks to the time of the insider's loan, which may or may not be after inception. Undercapitalization at the time of the loan exists if the debtor "could not have borrowed a similar amount of money from an informed outside source." *Id.* If the debtor could have raised the funds elsewhere on similar or better terms, the inference would be that a third party thought that the firm had enough equity capital and was, in light of that fact and others, creditworthy. One can therefore safely conclude that such a firm is not undercapitalized. If the firm could not have borrowed elsewhere, however, the firm was undercapitalized at the time of the insider's loan.

*In re Lifschultz Fast Freight*, 132 F.3d at 351.[17]   The Fifth Circuit Court of Appeals has adopted a

---

[17]   Judge Cudahy also instructs that the proper measure of capital requires further refinement of the financial analysis:

somewhat similar measure:

> Absolute measures of capital inadequacy, such as the amount of stockholder equity or other figures and ratios drawn from the cold pages of the corporation's balance sheets and financial statements, are of little utility, for the significance of this data depends in large part upon the nature of the business and other circumstances. Nor is the fact of eventual failure an appropriate test. *Cf. Automotriz Del Golfo de California S.A. DE C. v. Reswick*, 47 Cal.2d 792, 799, 306 P.2d 1, 6 (1957) (Carter J., dissenting) (disregard of corporate entity). This would be tantamount to ruling that an investor who takes an active role in corporate affairs must advance to his corporation all of the funds, which hindsight discloses it needed to survive. Instead,

---

> There really are two questions: what to measure, and how to measure it. The kind of capital a court is measuring has various names—shareholder equity, paid-in capital or equity capital—but whatever it is called, it means the excess of total assets over total liabilities. This is the kind of capital to which *Pepper* directed our attention, 308 U.S. at 309, 60 S.Ct. at 246, and it is the kind that *Mobile Steel* had in mind. *Mobile Steel*, 563 F.2d at 703. It is also the kind of capital upon which the Code predicates its definition of insolvency. *See* 11 U.S.C. § 101(32). Shareholder equity differs from other measures of capital that accountants and lawyers might use, such as a firm's total assets or the moribund concept of legal or stated capital (as in "par value"). William P. Hackney & Tracey G. Benson, *Shareholder Liability for Inadequate Capital*, 43 U. PITT. L. REV. 837, 890 (1982). It is "the cushion of protection afforded to creditors—net assets, or the total contribution made by the shareholders." *Id.*
>
> Shareholder equity should also be (but is not always) distinguished from working capital. Working capital is that portion of a firm's assets that are in relatively liquid form—the current assets such as cash, accounts receivable and inventory. Net working capital is the excess of current assets over current liabilities; it measures the ability of a firm to pay its debts as they mature. Working capital thus means something quite different from equity capital. The distinction is neatly shown with a balance sheet and the accounting identity A=L+NW (assets = liabilities plus net worth, or equity capital). Working capital refers to a kind of asset that the firm holds; it shows up as an entry on the left-hand side of the balance sheet. Equity capital, on the other hand, refers to a kind of claim against the assets of the firm, the owners' stake, and is entered on the right-hand side. The other kind of claim against the firm's assets is debt (or liability); and once all the liabilities of a firm have been set off against its assets (and assuming there are still some assets left), the residuum is equity capital. A common transaction involves a firm's using its equity capital as a basis for acquiring working capital—as in the case before us.

*In re Lifschultz Fast Freight*, 132 F.3d at 350.

28

we think that for the purposes of determining whether claims against the bankrupt estate held by organizers or shareholders should be subordinated on the ground of undercapitalization, the amount of capitalization that is adequate is

> what reasonably prudent men with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of incorporation of the now defunct enterprise.

N. Lattin, THE LAW OF CORPORATIONS §§ 15, 77 (1971); *cf.* H. Ballatine, CORPORATIONS 302-03 (rev. ed. 1946) (disregard of corporate entity); *see generally* E. Latty, SUBSIDIARIES AND AFFILIATED CORPORATIONS, 119-28 & 133-38 (1936). This general definition is helpful because it focuses on the culpability of the organizer-stockholders and pegs the assessment to more specific standards which do not involve open-ended quantitative questions. Foremost among the standards which the general statement suggests are the following:

> (1) Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized;

> (2) Capitalization is inadequate if, at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source.

*Benjamin v. Diamond* (*In re Mobile Steel Co.*), 563 F.2d 692, 702-03 (5th Cir. 1977).  As the Court

states in *Franklin Equipment I*, the Court finds that the same factors employed in a determination

of whether adequate capitalization exists in an equitable subordination context are equally applicable

under an analysis of capitalization in a recharacterization consideration.[18]

There is little evidence in this record upon which to found a conclusion that the Debtor was

inadequately capitalized at the time of the making of the April 23, 2008 Note.  The Debtor

---

[18] *See* fn. 16, *supra.*

commenced its business operations in 1951 and had operated continuously from that time. Apparently in times prior to those relevant here, the Debtor had enjoyed substantial business success. Commencing in the late 1990s, the Debtor experienced cash flow problems, which continued until its demise in late 2008. The failure of the Debtor to make payments on the April 23, 2008 Note was caused by its cash flow problems. That, however, is the full extent of the evidence of inadequate capitalization on the part of the Debtor put forth by the Trustee. No financial records of the Debtor nor any financial statements created by the Debtor's accountants for any time period have been adduced by the Trustee, who has had access and custody of the financial records of the Debtor for some period of time. The evidence is certain that the Debtor had cash flow problems for an extended period of time until its demise.

The Trustee urges that this Court should infer that the Debtor was inadequately capitalized at the time of the making of the April 23, 2008 Note because of the Drakes' admissions of the Debtor's cash flow problems. Such an inference, without additional evidence, is inappropriate. Cash flow difficulty alone is not sufficient evidence of inadequate capitalization. *See Malcolm v. Franklin Drywall, Inc.*, Civil. No. 06-4155, 2009 WL 690082, at *2 (D. Minn. Mar. 12, 2009) ("The evidence showed that Franklin Drywall's financial woes stemmed primarily from credit and cash flow problems, rather than from undercapitalization."); *Credit Managers Ass'n of S. Cal. v. Fed. Co.*, 629 F. Supp. 175, 183-84 (C.D. Cal. 1985) (finding that, even though the business was heavily in debt, the business had sufficient cash flow to service its debt load and continue operations and thus, was not undercapitalized as a result of a stock buyout). Thus, the Court finds that the Trustee has failed to produce sufficient evidence to show that the factor of inadequate capitalization of the Debtor at the time of the making of the April 23, 2008 Note is a genuine issue of material fact.

30

### 6. The Identity of Interest Between the Creditor and Stockholder

"If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated.  On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt." *AutoStyle*, 269 F.3d at 751 (citing *Roth Steel*, 800 F.2d at 630).  "'Where there is an exact correlation between the ownership interests of the equity holders and their proportionate share of the alleged loan . . . this evidence standing alone is almost . . . overwhelming.'" *Id.* (quoting *Cold Harbor*, 204 B.R. at 919). The Affidavits establish the common stock ownership of the Debtor at the time of the making of the April 23, 2008 Note was as follows: Roger Drake, 24.36%; Wilson Drake, 22.19%; and Randy Drake, 22.19%; the remainder of the stock was divided among six other individuals.  Drake Affidavit ¶ 3; Wilson Drake Affidavit ¶ 3; Randy Drake Affidavit ¶ 2.  The monies advanced under the April 23, 2008 Note were done solely by Roger Drake.  No other shareholder of the Debtor participated in the April 23, 2008 Note.  Accordingly, analysis of this factor strongly indicates the April 23, 2008 Note was intended as a loan.

### 7. The Security for the Advances

"The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans." *AutoStyle*, 269 F.3d at 752 (citing *Roth Steel*, 800 F.2d at 631).  As has been discussed, Drake secured the repayment of the April 23, 2008 Note with a lien upon the MetLife Policy.  Drake Affidavit ¶ 4; Wilson Drake Affidavit ¶ 5; Randy Drake Affidavit ¶ 3.  Therefore, this factor cuts in favor of a loan.

### 8. The Corporation's Ability to Obtain Outside Financing

"When there is no evidence of other outside financing, the fact that no reasonable creditor

31

would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." *AutoStyle*, 269 F.3d at 752 (citing *Roth Steel*, 800 F.2d at 631). There is nothing in the existing record that indicates any efforts on the part of the Debtor to attempt to obtain outside financing at the time of the making of the April 23, 2008 Note. The financial circumstances of the Debtor set forth by Wilson Drake in his affidavit in paragraph 10 certainly indicate a difficult financial position for the Debtor as it approached the end of its operations, which may have made obtaining outside financing unlikely.

9. The Extent to Which Advances Were Subordinated to Claims of Outside Creditors

"Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans." *Id*. (citing *Roth Steel*, 800 F.2d at 631-32). The advances under the April 23, 2008 Note were not subordinated to the claims of any of the Debtor's creditors. Drake Affidavit ¶10. This is strongly indicative of debt.

10. The Extent to Which Advances Were Used to Acquire Capital Assets

"Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *AutoStyle*, 269 F.3d at 752 (citing *Roth Steel*, 800 F.2d at 632). The proceeds of the April 23, 2008 Note were used for general business operations. Wilson Drake Affidavit ¶ 8. Therefore, this factor weighs toward debt.

11. The Presence or Absence of a Sinking Fund to Provide Repayments

"The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." *AutoStyle*, 269 F.3d at 753 (citing *Roth Steel*, 800 F.2d at 632). Here the Debtor never established a sinking fund for the retirement of the April 23, 2008

32

Note.  However, in the Court's experience, it is unusual in commercial transactions involving lines

of credit for any non-insider lender to require establishment of a sinking fund, and particularly so

where the borrower is a smaller, non-publicly traded entity such as the Debtor.  Furthermore, the

pledging of collateral for the repayment of the April 23, 2008 Note by the Debtor also mitigates the

absence of a sinking fund.  *Id.*  ("The bankruptcy court noted the absence of a sinking fund and

concluded that this factor weighed toward equity.  We agree with the district court, however, that

'the loans were secured with liens, which obviated any need for a sinking fund.'  Therefore, we

conclude that this factor only slightly weighs toward equity, if at all."); *Matrix IV, Inc. v. Am. Nat'l*

*Bank & Trust Co. of Chicago* (*In re S.M. Acquisition Co.*), No. 05-C-7076, 2006 WL 2290990,

at*10, n.13 (N.D. Ill. Aug. 7, 2006) (internal citations omitted) ("The [motion for a more definite

statement] does not mention the existence or absence of a sinking fund, though the Bank's response

brief suggests that the Bank did not require such a fund.  Nonetheless, this factor does not seem

particularly relevant, as secured liens apparently mitigate the need for a sinking fund.").  Here the

absence of a sinking fund is a neutral factor, at best.

### C.  An Analysis of the Matters Raised in the Trustee's Objection

In her objection, the Trustee references a volume of material that she believes establishes a

material issue of fact as to the recharacterization of the April 23, 2008 Note but which are not

directly responsive to any one of the *Dornier* factors.  The Trustee makes reference to the financial

history of the Debtor as disclosed in the various deposition excerpts attached as exhibits to her

objection.  These excerpts include the following:

1.  Randy Drake's deposition testimony that the decline of the paper industry in 1999 in turn

"dragged forestry [the industry to which the Debtor sold most of its manufactured equipment] down

33

pretty hard" and that the Debtor did not return to positive cash flow after the reduction and consolidation of the paper mill market despite "[e]ven last year we saw some [positive] signs and then it died."  Trustee's Objection, Exhibit A.

2.   Drake's deposition testimony that SunTrust Bank, which had extended credit to the Debtor, expressed concerns about the Debtor's ability to service its indebtedness in 1999 and 2000. Trustee's Objection, Exhibit B.

3.   Roger Drake, Wilson Drake, and Randy Drake were required by SunTrust Bank to execute partial guaranties of the indebtedness of the Debtor to SunTrust in August 2001.  Trustee's Objection, Exhibits C, D, and E.

4.   In October 2002, the Drakes met with representatives of SunTrust Bank to discuss the financial problems of the Debtor.  SunTrust believed the Debtor was experiencing financial losses and began requiring the Debtor to make non-scheduled principal reduction payments of $600,000.00 each quarter in 2002.  Trustee's Objection, Exhibits F, G, H, I, J, K, L, M, and N.

5.   At some point, the Debtor was unable to make the quarterly principal curtailment payments.  As summarized in an internal SunTrust e-mail, the bank agreed not to require the principal reduction payments as of January 1, 2003.  Trustee's Objection, Exhibit O.

6.   Keith Cuthrell, then-counsel to the Debtor, received telephone calls from either Wilson Drake or Randy Drake that SunTrust was restricting the Debtor's borrowing, which was "choking" them, and "they were going to have to . . . make other arrangements."  Trustee's Objection, Exhibit P.

7.   Drake testified in his deposition that SunTrust wanted the Debtor to pay its loans with

SunTrust.  Trustee's Objection, Exhibit Q.

8.  The Drakes explored selling the Debtor before paying SunTrust "but no one . . . had [an] appetite for a company that was bleeding money at that point in time."  Trustee's Objection, Exhibit R.

9.  Wilson Drake testified that other options for financing were explored but could not be consummated because of the losses of the Debtor for "the last two or three years."  Trustee's Objection, Exhibit S.

10.  The Drakes bought the indebtedness of the Debtor with SunTrust on May 1, 2003, and the Debtor executed a replacement note payable to the Drakes, requiring the Debtor to make payments of $17,777.00 each month, which payments ceased after July 2006.  After the payments ceased, the Drakes did not undertake any collection efforts but instead "tried to help the company keep alive" and "were waiting until the payments could "restart . . . when the company had the cash flow to pay us," which the company was unable to do.  Trustee's Objection, at 10 and Exhibit T.

11.  In August 2001, Drake made a loan to the Debtor in the form of a line of credit in the amount of $1 million, which was secured by a first priority deed of trust on the Debtor's manufacturing facility.[19]  Trustee's Objection, at 11.

12.  Drake made loans to the Debtor beginning in September 2005 and extending to November 22, 2006, under eighty-six notes referred to as "the Floor Plan Notes," each of which was secured by a specific piece of equipment.  Drake often permitted the Debtor to sell equipment

---

[19]  There is no specific reference for this assertion on page 11 of the Trustee's Objection, although as a result of the motion for relief proceeding in *Franklin Equipment I*, the Court is aware that this event did in fact occur.

without requiring the retirement of the related debt under "the Floor Plan Notes."  Trustee's
Objection, Exhibit U.

13.  Keith Cuthrell testified he had learned the Debtor did not have the money to continue
operating if it had paid "the Floor Plan Notes" when they were due, which Roger Drake acquiesced
in "from time to time, to try to keep the company alive."  Trustee's Objection, Exhibit V.

14.  Cuthrell also testified that the shareholders met with "us" (presumably the law firm of
Willcox & Savage) to discuss the financial status of the Debtor in the period of 2000–2007, and the
firm prepared an agenda dated May 30, 2001, for a conference exploring different financial options
of the Debtor.  Trustee's Objection, Exhibits V-1, V-2.

Accordingly, the Trustee summarizes her evidence on the issue of recharacterization as
follows:

> When the transactions are viewed in their totality, coupled with the documentary and
> testimony evidence, it is clear that the Drakes were acting to protect their investment
> interest in the Debtor.  None of the "loan" transactions appear to have been the result
> of arms length negotiations. . . . [The Drakes] further continued to invest money even
> after it became clear that the Debtor could not, and would not be able, to pay either
> on the old "loans" or on the new "loans." . . . [T]he Drakes, including the Plaintiff,
> acted and were acting as classic capital investors hoping to be paid out of future
> profits of the Debtor.

Trustee's Objection, at 14-15.  Assuming these assertions are true, as the Court must in a summary
judgment consideration, are they sufficient to raise an issue of material fact for trial and to deny the
entry of judgment to Drake on the defense of recharacterization?

The Court considered similar factual evidence at the final hearing conducted in *Franklin
Equipment I*, *see Franklin Equipment I*, at *7-11, and found it wanting to establish an imperative
to recharacterize the debt at issue there as an equity contribution.  As this Court wrote, considering

36

this evidence in the context of the *Dornier* factor of inadequate capitalization:

> The Debtor had commenced its business operations in 1951 and had operated continuously from that time. Apparently in times prior to those relevant here, the Debtor had enjoyed substantial business success.  Commencing in the late 1990s, the Debtor experienced cash flow problems, which continued until its demise in late 2008.  The failure of the Debtor to continue regular payments on the Line of Credit Note in June 2005 was caused by its cash flow problems.  Additionally, both Wilson Drake and Randy Drake testified that the Debtor at times had experienced operating losses.

*Franklin Equipment I* at *25.

The identical portrait has been painted here by the Trustee.  As this Court previously observed, it is doubtless that the Debtor experienced cash flow problems, commencing as early as 1999.  A reflection on the nature of a cause for recharacterization under *Dornier* is instructive here. It is different from a cause for equitable subordination; as Judge Shelley has reminded us, "[r]ather than recharacterizing the exchange from debt to equity, or subordinating the claim for some reason, the question before this Court is whether the transaction created a debt or equity relationship from the outset." *In re Cold Harbor*, 204 B.R. at 915.  Furthermore, the danger of recharacterizing a loan as a capital contribution is apparent:

> Moreover, the lending of funds to an undercapitalized debtor alone is by itself insufficient either for a finding of inequitable conduct or to warrant recharacterization of debt.  Some other conduct must also be found for undercapitalization to constitute a basis for recharacterizing debt into equity, lest insiders and others shy away from lending to a corporation in financial distress or a venture at higher than usual risk.

*Herzog v. Leighton Holdings, Ltd.* (*In re Kids Creek Partners, L.P.*), 212 B.R. 898, 932 (Bankr. N.D. Ill. 1997) (citing *Braas Sys. Inc. v. WMR Partners* (*In re Octagon Roofing*), 157 B.R. 852, 858 (N.D. Ill. 1993)); *see also Dornier*, 453 F.3d at 234 ("In many cases, an insider will be the only party

37

willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans.").

An application of the *Dornier* factors to the record before the Court suggests there are no material factual disputes here. The Drake Affidavit, the Wilson Drake Affidavit, the Randy Drake Affidavit, and the Supplemental Affidavit provide ample uncontradicted evidence for the Court to apply the *Dornier* factors and conclude the April 23, 2008 Note was intended at the outset to be debt, even when considering the Debtor's difficult financial history from 1999 onward as relied upon by the Trustee. It is certain that Drake and his sons provided substantial financial support to the Debtor in the form of loans to the Debtor from 2001 until the Debtor's cessation of business operations. It is also now certain, with the benefit of hindsight, that by the time of the making of the April 23, 2008 Note, the financial condition of the Debtor was very difficult and problematic as outlined by Wilson Drake in the Supplemental Affidavit. However, the precarious financial condition of the Debtor, without any substantial support by application of the *Dornier* factors to the present record here, is insufficient to warrant recharacterization of the April 23, 2008 Note.

Counsel for the Trustee urges, not only in the Trustee's Objection and the Trustee's Supplemental Memorandum but also at the hearing held on this matter, that a factual dispute exists and that this matter involves "many complex factual issues" and "significant legal issues." However, merely making such assertions does not sustain the Trustee's burden as set forth by Federal Rule of Civil Procedure 56(e)(2) to respond to a motion for summary judgment with more than "allegations or denials in [her] own pleading; rather, [the] response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." While the Trustee has arguably submitted facts, those facts do not show that a genuine issue for trial exists

with regard to recharacterization.  Simply put, the Trustee failed to carry her burden under Federal

Rule of Civil Procedure 56(e)(2).  The record before this Court contains ample factual support for

a finding that the April 23, 2008 Note should not be recharacterized as equity.  Accordingly, there

appears to be no material fact in dispute on the defense of recharacterization, and the Court finds that

Drake is entitled to entry of a judgment determining there is no legal basis for the recharacterization

of the April 23, 2008 Note as a capital contribution.

> VIII.  The Defense of the Trustee that the April 23, 2008 Note was Unfunded
> and that the Monies Which Were Advanced Were Under the Twenty-Six Notes
> and are Therefore Not Secured by the Metlife Policy

The second defense raised by the Trustee to the Partial Summary Judgment Motion relates

to the claimed use by Drake of the Twenty-Six Notes made by the Debtor as "advances" under the

April 23, 2008 Note.  The Trustee argues that "unless the Plaintiff can point to some ambiguity

identified in those documents, he is barred by the parole [sic] evidence rule from attempting to

introduce any extrinsic evidence to alter, modify or change the terms and conditions explicitly stated

in those documents" and "[e]ven if the Court determines that the parole [sic] evidence rule is not a

bar to consideration of Plaintiff's intent in interpreting the Promissory Notes and [the April 23,

2008] Note, the issue of the Plaintiff's intent is a factual inquiry that cannot be resolved by the Court

on summary judgment."  Trustee's Supplemental Memorandum, at 2, 8.[20]  The first consideration

---

[20]  As aforementioned, in his Supplemental Memorandum, Drake attempted to anticipate
and refute an argument by the Trustee that his liens on the MetLife Policy were subject to
avoidance by the Trustee under 11 U.S.C. § 547 as a preference.  The Trustee instead argues that
Drake's lien can be set aside as a fraudulent conveyance pursuant to 11 U.S.C. §§ 544 and 548.
No adversary proceeding under these avoidance sections has been initiated by the Trustee
against Drake nor has the Trustee asserted such contentions in her Counterclaim in this adversary
proceeding.  *See* Sections I, IV, *supra.*  As the Trustee does not raise these potential avoidance
actions as either a defense or as a counterclaim in her pleadings, nor does she elaborate on the

for this Court therefore must be the Trustee's argument that the relevant documents here are unambiguous and the parol evidence rule prohibits the consideration of evidence beyond the four corners of the documents.[21]   Secondly, the Court must reflect on what standard is appropriate to adjudicate the validity of the alleged lien of Drake upon the MetLife Policy.

   A.   Does the Parol Evidence Rule Prohibit the Court's Consideration of
         Matters Beyond the Four Corners of the Relevant Documents?

   The Trustee cites the familiar parol evidence rule as applied in Virginia that " when a writing is complete on its face and is certain and definite as to the objects of the agreement, the writing is 'conclusively presumed' to be the entire contract between the parties, which cannot be contradicted or modified by parol or extrinsic evidence." *Fed. Deposit Ins. Corp. v. Hadid*, 947 F.2d 1153, 1156 (4th Cir. 1991).   Drake argues Virginia statutory and case law abrogates application of the parol evidence rule to transactions such as those at issue in the Complaint and that the Court can consider any relevant evidence to establish the course of dealing between Drake and the Debtor.

---

alleged merits of these potential avoidance actions in her Objection or her Supplemental Memorandum, the Court will not consider these potential avoidance actions in adjudicating the Partial Summary Judgment Motion.

   [21]   There appears to be no dispute that the collateral assignment of the MetLife Policy properly occurred by the acknowledgment by MetLife of the Collateral Assignment, attached as Exhibit D to the Complaint, in accordance with Virginia law, which excludes life insurance assignments from the requirements of the Uniform Commercial Code as enacted in Virginia, VA. CODE ANN. § 8.9A-109(d)(8), and that the Security Agreement executed by the Debtor is valid and binding.   It also appears it is not disputed that Drake advanced just over $1 million to the Debtor in connection with the transactions that are the subject of this adversary proceeding. Accordingly, given the Court's finding of entitlement of Drake to entry of summary judgment on the issue of recharacterization of the April 23, 2008 Note as an equity contribution, the sole remaining defense of the Trustee is her contention that the monies advanced by Drake were not funded under the April 23, 2008 Note and therefore the April 23, 2008 Note is unfunded and the MetLife Policy does not secure the April 23, 2008 Note.

Virginia courts have consistently applied the parol evidence rule to exclude extrinsic evidence except where an ambiguity is present.  *See, e.g.*, *Ott v. L & J Holdings, LLC*, 275 Va. 182, 187, 654 S.E.2d 902, 905 (2008) (citing *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 632, 561 S.E.2d 663, 667-68 (2002)) ("When a document is ambiguous . . . the court will look to parol evidence in order to determine the intent of the parties.").  Virginia courts have also long recognized an exception to the parol evidence rule, known as the "collateral contract" doctrine, that proof of a prior or contemporaneous oral agreement not inconsistent with the written agreement may be introduced.  "'Under this doctrine the parol evidence rule does not exclude parol proof of a prior or contemporaneous oral agreement that is independent of, collateral to and not inconsistent with the written contract, and which would not ordinarily be expected to be embodied in the writing.'"  *Nelson v. Commonwealth*, 235 Va. 228, 246, 368 S.E.2d 239, 249 (1988) (quoting *High Knob, Inc. v. Allen*, 205 Va. 503, 506, 138 S.E.2d 49, 52 (1964)).

The adoption of the Uniform Commercial Code in Virginia has further reinforced the appropriateness of admitting extrinsic evidence to reflect the course of dealing of parties in a commercial context.[22]  As the Fourth Circuit Court of Appeals has recognized:

---

[22]  Section 8.1A-303 of the Virginia Code provides the following definitions of course of performance and course of dealing:

(a)  A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:

(1)  the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

(2)  the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

41

A number of Virginia cases have held that extrinsic evidence may not be received to explain or supplement a written contract unless the court finds the writing is ambiguous. *E.g.*, *Mathieson Alkali Works v. Virginia Banner Coal Corp.*, 147 Va. 125, 136 S.E. 673 (1927). This rule, however, has been changed by the Uniform Commercial Code which Virginia has adopted. The Code expressly states that it "shall be liberally construed and applied to promote its underlying purposes and policies," which include "the continued expansion of commercial practices through custom, usage and agreement of the parties . . . ." VA. CODE ANN. § 8.1-102 (1965). The importance of usage of trade and course of dealing between the parties is shown by § 8.2-202, which authorizes their use to explain or supplement a contract. The official comment states this section rejects the old rule that evidence of course of dealing or usage of trade can be introduced only when the contract is ambiguous. And the Virginia commentators, noting that "[t]his section reflects a more liberal

---

(b) A "course of dealing" is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

    . . . .

(d) A course of performance or course of dealing between the parties . . . is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement. . . .

(e) Except as otherwise provided in subsection (f), the express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed whenever reasonable as consistent with each other. If such a construction is unreasonable:

    (1) express terms prevail over course of performance, course of dealing, and usage of trade;

    (2) course of performance prevails over course of dealing and usage of trade; and

    (3) course of dealing prevails over usage of trade.

(f) Subject to § 8.2-209, a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance.

VA. CODE ANN. § 8.1A-303(a)–(b), (d)–(f).

> approach to the introduction of parol evidence . . . than has been followed in
> Virginia," express the opinion that *Mathieson*, *supra*, and similar Virginia cases no
> longer should be followed.  VA. CODE ANN. § 8.2-202, Va. Comment.  *See also*
> *Portsmouth Gas Co. v. Shebar*, 209 Va. 250, 253 n.1, 163 S.E.2d 205, 208 n.1 (1968)
> (dictum).  We hold, therefore, that a finding of ambiguity is not necessary for the
> admission of extrinsic evidence about the usage of the trade and the parties' course
> of dealing.

*Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 8-9 (4th Cir. 1971).  *See also Am. Realty Trust*

*v. Chase Manhattan Bank, N.A.*, 222 Va. 392, 281 S.E.2d 825 (1981) (finding that "the intention of

the parties is the controlling factor").  However, it remains the case that extrinsic evidence

concerning a course of dealing may not be utilized to vary the express terms of an agreement under

the Uniform Commercial Code or otherwise.  As the Fourth Circuit Court of Appeals again noted

in *Columbia Nitrogen*:

> We turn next to Royster's claim that Columbia's evidence was properly excluded
> because it was inconsistent with the express terms of their agreement.  There can be
> no doubt that the Uniform Commercial Code restates the well established rule that
> evidence of usage of trade and course of dealing should be excluded whenever it
> cannot be reasonably construed as consistent with the terms of the contract.  *Division*
> *of Triple T Service, Inc. v. Mobil Oil Corp.*, 60 Misc. 2d 720, 304 N.Y.S.2d 191, 203
> (1969), *aff'd mem.*, 311 N.Y.S.2d 961 (1970).  Royster argues that the evidence
> should be excluded as inconsistent because the contract contains detailed provisions
> regarding the base price, escalation, minimum tonnage, and delivery schedules.  The
> argument is based on the premise that because a contract appears on its face to be
> complete, evidence of course of dealing and usage of trade should be excluded.  We
> believe, however, that neither the language nor the policy of the Code supports such
> a broad exclusionary rule.  Section 8.2-202 expressly allows evidence of course of
> dealing or usage of trade to explain or supplement terms intended by the parties as
> a final expression of their agreement.  When this section is read in light of Va. Code
> Ann. § 8.1-205(4), it is clear that the test of admissibility is not whether the contract
> appears on its face to be complete in every detail, but whether the proffered evidence
> of course of dealing and trade usage reasonably can be construed as consistent with
> the express terms of the agreement.

43

*Id.* at 9. *Accord*, *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 799 (9th Cir. 1981).[23]

Virginia courts have also declined to apply the parol evidence rule to exclude extrinsic evidence

where modification of an agreement is alleged to have occurred through a course of dealing of the

parties:

> [A] course of dealing by contracting parties, considered in light of all the circumstances, may evince mutual intent to modify the terms of [a] contract. *See Kent v. Kent*, 2 Va. Dec. 674, 678, 34 S.E. 32, 33 (1899). . . . But the circumstances surrounding the conduct of the parties must be sufficient to support a finding of a 'mutual intention' that the modification be effective, *Warren v. Goodrich*, 133 Va. 366, 388, 112 S.E. 687, 694 (1922), and such intention must be shown by 'clear, unequivocal and convincing evidence, direct or implied', *id.* at 389, 112 S.E. at 694. And when one party claims that the other party has surrendered a right guaranteed by the contract, the party asserting such modification must prove either passage of valuable consideration, estoppel *in pais*, or waiver of the right.

*Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 73, 306 S.E.2d 870, 873 (1983) (quoted in

*Cardinal Dev. Co. v. Stanley Constr. Co.*, 255 Va. 300, 305, 497 S.E.2d 847 (1998)).

In the context of deciding whether a so-called "dragnet" clause was intended to include

certain indebtedness as secured or not, one court has recognized the necessity of considering

---

[23] Virginia's Uniform Commercial Code supports this conclusion by its definition of "agreement," which provides:

> (b)  Subject to definitions contained in other titles of the Uniform Commercial Code that apply to particular titles or parts thereof:
>
> . . . .
>
> (3)  "Agreement," as distinguished from "contract," means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade as provided in § 8.1A-303.

VA. CODE ANN. § 8.1A-201.

44

extrinsic evidence uninhibited by the restrictions of the parol evidence rule:

> [T]he Court must also determine precisely what kind of evidence that it can consider
> when so applying the "relatedness rule" and the Four-Part Test [to determine if
> certain indebtness was intended to be secured debt].  Some courts approve of the
> taking of testimonial evidence when applying the above rule and test.  However,
> other courts, by virtue of what they consider to be a strict application of the parol
> evidence rule, hold that testimonial evidence of the parties may not be admitted and
> that recourse may only be had to relevant documentary evidence.  This Court cannot
> agree that the parol evidence rule should, or even actually can, be strictly respected
> when applying the "relatedness rule" and the Four-Part Test to a dragnet clause
> because (a) the application of said rule and test necessarily dictates that loan
> documents for indebtednesses other than the primary obligation be considered, such
> as when determining whether (i) the other indebtednesses were intended to be
> separately secured, and (ii) the secured party relied on the dragnet clause in making
> further loans, (b) the documentation for said other indebtednesses is obviously
> evidence that is found outside of the four corners of the document (i) memorializing
> the primary obligation, and (ii) containing the dragnet clause at issue, (c) evidence
> outside of the four corners of a particular document, by definition, is parol or
> extrinsic evidence . . . , and (d) the issue of the enforceability of an otherwise clearly-
> worded dragnet clause is similar to, if not subsumed within, the broader issue of
> whether a portion of a written contract may be invalidated, for which issue parol
> evidence is admissible.  Therefore, this Court will not look to the parol evidence rule
> as a basis for any decision on its part in the instant matters to bar the taking of
> testimonial evidence and to confine itself to only a consideration of relevant
> documentary evidence.

*Allegheny-Ludlum Brackenridge Fed. Credit Union* (*In re Fassinger*), 246 B.R. 513, 522 (Bankr.

W.D. Pa. 2000) (internal citations omitted).

The inapplicability of invocation of the parol evidence rule by the Trustee to block

consideration of the evidence offered by Drake in the Affidavits and the Supplemental Affidavit

accompanying the Partial Summary Judgment Motion is apparent when considering the exact factual

issue that must be resolved by the Court here.   The Security Agreement provides that the

indebtedness secured by the MetLife Policy is "the obligations and liabilities of [the Debtor] to

Drake pursuant to the [April 23, 2008] Note and the loans evidenced thereby, whether now existing

45

or hereafter incurred."  As such, the provisions of the Security Agreement on this point appear plain and unambiguous.

The question raised by the Trustee is whether the monies indisputably advanced by Drake to the Debtor were in fact done so "pursuant to the [April 23, 2008] Note and the loans evidenced thereby."  Consideration of Drake's evidence in this regard seeks not to modify an express provision of the Security Agreement as to what indebtedness is intended to be secured by the MetLife Policy. Rather, this evidence is for the purpose of determining whether the monies advanced by Drake were in fact intended by Drake and the Debtor to be considered as advances under the April 23, 2008 Note (as documented by the use of the Twenty-Six Notes), or whether the Twenty-Six Notes were actually stand-alone funding instruments unconnected to the April 23, 2008 Note and/or the Security Agreement.  In proffering the evidence contained in the Affidavits, Drake is not utilizing this information to attempt to vary the plain terms of the Security Agreement or rewrite the agreement between Drake and the Debtor.  Instead, Drake seeks to use this information to prove that he and the Debtor considered the monies he advanced "utilizing" the Twenty-Six Notes to be "loans" under the April 23, 2008 Note.  Accordingly, the parol evidence rule as applied in Virginia does not preclude consideration of this evidence.

### B.  By What Standard Must the Court Adjudicate Whether Drake Has a Lien Upon the MetLife Policy?

The powers of a Chapter 7 trustee are defined by the Bankruptcy Code.  The powers of a bankruptcy trustee pertinent to the present case arise principally from two sources: (1) the rights of

the debtor, 11 U.S.C. § 541,[24] and (2) the rights of creditors of the debtor, 11 U.S.C. § 544.[25]

---

[24] Section 541 provides, in pertinent part:

(a)  The commencement of a case under section 301, 302, or 303 of this title creates an estate.  Such estate is comprised of all the following property, wherever located and by whomever held:

> (1)  Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

> (2)  All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—

>> (A)  under the sole, equal, or joint management and control of the debtor; or

>> (B)  liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

> (3)  Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

> (4)  Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.

> (5)  Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date—

>> (A)  by bequest, devise, or inheritance;

>> (B)  as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree; or

>> (C)  as a beneficiary of a life insurance policy or of a death benefit plan.

47

*Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 135 (4th Cir. 1988).  Judge Mitchell of

this Court has summarized these powers:

> Property of the bankruptcy estate includes all legal or equitable interests of the
> debtor in property as of the filing date.  § 541(a), Bankruptcy Code.  Property rights

_____

> (6)  Proceeds, product, offspring, rents, or profits of or from
> property of the estate, except such as are earnings from services
> performed by an individual debtor after the commencement of the
> case.

> (7)  Any interest in property that the estate acquires after the
> commencement of the case.

11 U.S.C. § 541(a).

> [25]  Section 544 provides in relevant part:

> (a)  The trustee shall have, as of the commencement of the case, and without
> regard to any knowledge of the trustee or of any creditor, the rights and powers
> of, or may avoid any transfer of property of the debtor or any obligation incurred
> by the debtor that is voidable by—

> > (1)  a creditor that extends credit to the debtor at the time of the
> > commencement of the case, and that obtains, at such time and with
> > respect to such credit, a judicial lien on all property on which a
> > creditor on a simple contract could have obtained such a judicial
> > lien, whether or not such a creditor exists;

> > (2)  a creditor that extends credit to the debtor at the time of the
> > commencement of the case, and obtains, at such time and with
> > respect to such credit, an execution against the debtor that is
> > returned unsatisfied at such time, whether or not such a creditor
> > exists; or

> > (3)  a bona fide purchaser of real property, other than fixtures,
> > from the debtor, against whom applicable law permits such
> > transfer to be perfected, that obtains the status of a bona fide
> > purchaser and has perfected such transfer at the time of the
> > commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a).

> are determined in the first instance by state law. *Butner v. United States*, 440 U.S.
> 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). As a general proposition, the trustee takes
> only such rights as the debtor had in the property under state law. The trustee does,
> however, have special powers that operate to augment the bankruptcy estate by
> reversing certain transfers and stripping off certain interests. Among these powers
> are the trustee's "strong arm" powers in § 544, Bankruptcy Code, as well as the
> trustee's powers to avoid preferences, fraudulent transfers, and certain statutory
> liens. §§ 547(b), 548(a) and (b), and § 545, Bankruptcy Code.

*In re Plascencia*, 354 B.R. 774, 778 (Bankr. E.D. Va. 2006). In taking the rights of the debtor in

property, the trustee also must bear the burden of any defenses that may be asserted. "It is well

established that a trustee in bankruptcy stands in the shoes of the debtor and has no greater rights

than the debtor itself had. Thus, any defense, legal or equitable, which might have been raised

against a debtor may be raised against the trustee." *Stratton v. Sacks*, 99 B.R. 686, 692 (D. Md.

1989) (citing *In re Gebco Inv. Corp.*, 641 F.2d 143, 146 (3d Cir. 1981); *Mut. Life Trust Ins. Co. v.

Wemyss*, 309 F. Supp. 1221, 1231 (D. Me. 1970); 2 COLLIER ON BANKRUPTCY § 323.02[4] (15th

ed.)). If the Drake Claim constitutes a valid lien on the MetLife Policy as to the Debtor, the Trustee

would have no basis pursuant to 11 U.S.C. § 541 as the successor to the rights of the Debtor to

invalidate this lien.

The second genre of powers relied upon here by the Trustee is founded in her so-called

"strong-arm" powers pursuant to 11 U.S.C. § 544.[26] "[P]ursuant to 11 U.S.C. § 544(a)(1), the trustee

holds the position of a hypothetical judgment lien creditor effective on the date the debtor[] filed

the[] bankruptcy petition; the trustee is thus entitled to priority over unperfected liens." *Chrysler*

---

[26] As previously noted, the Trustee has not plead any avoidance actions against Drake
pursuant to 11 U.S.C. §§ 547 (preference) or 548 (fraudulent transfer), and accordingly the Court
will not consider such actions as a basis to find the invalidity of the alleged lien of Drake upon
the MetLife Policy.

*Fin. Co. v. Darrington* (*In re Darrington*), 251 B.R. 808, 810 (Bankr. E.D. Va. 1999). However, this power may not disturb perfected liens: "'Exercising his 'strong arm powers,' a trustee can disregard the rights of subsequent creditors taking priority after him, but his rights are subordinate to those with valid liens as of the petition date." *Ivester v. Miller*, 398 B.R. 408, 416 (M.D.N.C. 2008) (citing 11 U.S.C. §§ 544(a)(1), (3); *Perlow v. Perlow*, 128 B.R. 412, 415 (E.D.N.C. 1991)).

Similarly, the Fourth Circuit has held that:

> [W]hile it is the federal law which provides the trustee with his "strong-arm" power, his exercise of such power and its extent are governed entirely by the applicable state law. . . . [*The strong-arm section*] *confers on the trustee no "greater rights than those accorded by the applicable* [*state*] *law to a creditor holding a lien by legal or equitable proceedings.*"

*Havee v. Belk*, 775 F.2d 1209, 1218-19 (4th Cir. 1985) (emphasis added) (quoting *In re Investors Funding Corp. of N.Y.*, 452 F. Supp. 771, 775 (S.D.N.Y. 1978)). *Accord Angeles Real Estate Co. v. Kerxton* (*In re Constr. Gen., Inc.*), 737 F.2d 416, 418 (4th Cir. 1984) ("A trustee in bankruptcy stands in the shoes of the bankrupt and succeeds only to the bankrupt's interest in property [as a judgment lien creditor]. . . . Thus, if under applicable state law a judgment lien creditor would prevail over an adverse claimant, the trustee in bankruptcy will prevail; if not, he will not."). The legal requirements of a lien, the priority of a lien, and the extent of property interests encumbered by a lien are determined by state law. *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law."); *Trust Corp. of Montana v. Patterson* (*In re Copper King Inn, Inc.*), 918 F.2d 1404, 1407 (9th. Cir. 1990) ("State law controls the validity and effect of liens in the bankruptcy context."); *Paramount Int'l, Inc. v. First Midwest Bank* (*In re Paramount Int'l Inc.*), 154 B.R. 712, 714 (Bankr. N.D. Ill. 1993) ("Bankruptcy courts normally look

to state law to determine interests in property and the perfection of liens therein.") (citing *Butner*,

440 U.S. at 55).  Generally, consensual liens upon goods are governed by the Uniform Commercial

Code as enacted in the various states.  *GAF Linden Employees Credit Union v. Robertson* (*In re*

*Robertson*), 232 B.R. 846, 848 (Bankr. D. Md. 1999).  Accordingly, the task that remains for this

Court is to adjudicate whether Drake has a valid lien upon the MetLife Policy under Virginia law

vis-à-vis the Debtor and the Trustee by reason of her rights as successor to the Debtor, or if the lien

of Drake upon the MetLife Policy would be valid under Virginia law as to a judgment lien creditor

as of the Petition Date.  Judge Krumm has summarized this distinction:

> In Virginia a security interest must attach and be perfected to be enforceable against
> the debtor and third parties. *See In re Johnson*, 179 B.R. 800, 803 (Bankr. E.D. Va.
> 1995) (citing VA. CODE § 8.9A-203 and discussing security interests under Virginia
> law).  A security interest attaches when the debtor signs a security agreement
> describing the collateral, when value has been given, and when the debtor has rights
> in the collateral.  *See* VA. CODE § 8.9A-203.  Once attached, the security interest is
> enforceable against the debtor.  To be enforceable against third parties, however, the
> security interest must be perfected.  *See Johnson*, 179 B.R. at 804.  The method of
> perfection varies according to the type of collateral covered by the security interest.

*Leake v. Oakwood Acceptance Corp.* (*In re Wuerzberger*), 271 B.R. 778, 783 (Bankr. W.D. Va.

2002).[27]

---

[27]  Section 8.9A-203 of the Uniform Commercial Code as enacted in Virginia provides in
relevant part:

> (a)  Attachment.  A security interest attaches to collateral when it becomes
> enforceable against the debtor with respect to the collateral, unless an agreement
> expressly postpones the time of attachment.

> (b)  Enforceability.  Except as otherwise provided in subsections (c) through (i), a
> security interest is enforceable against the debtor and third parties with respect to
> the collateral only if:

> > (1)  value has been given;

It does not appear that any Virginia decision has considered the exact factual issue presented

here.  In a somewhat analogous factual setting, Judge Tice of this Court has addressed whether a so-

called "dragnet" clause in a security agreement included certain debt as secured by its terms.  Judge

Tice extensively reviewed the decisions of other jurisdictions that require indebtedness to be in some

way related to one another to be deemed secured under an agreement:

> Although no one disputes that Virginia law must be applied, the courts of the
> Commonwealth have neither addressed this particular issue nor expressed a view on
> the propriety of dragnet clauses in general.  The vast majority of states, however,
> have looked upon dragnet clauses with disfavor and have required that the debts

---

> (2)  the debtor has rights in the collateral or the power to transfer
> rights in the collateral to a secured party; and
>
> (3)  one of the following conditions is met:
>
>> (A)  the debtor has authenticated a security
>> agreement that provides a description of the
>> collateral and, if the security interest covers timber
>> to be cut, a description of the land concerned;
>>
>> (B)  the collateral is not a certificated security and is
>> in the possession of the secured party under § 8.9A-
>> 313 pursuant to the debtor's security agreement;
>>
>> (C)  the collateral is a certificated security in
>> registered form and the security certificate has been
>> delivered to the secured party under § 8.8A-301
>> pursuant to the debtor's security agreement; or
>>
>> (D)  the collateral is deposit accounts, electronic
>> chattel paper, investment property, letter-of-credit
>> rights, or electronic documents, and the secured
>> party has control under §§ 8.7-106, 8.9A-104, 8.9A-
>> 105, 8.9A-106, or § 8.9A-107 pursuant to the
>> debtor's security agreement.

VA. CODE ANN. § 8.9A-203(a)–(b).

sought to be brought within their reach be specifically referenced or bear some relation to one another.

*In re Lewis*, 212 B.R. 827, 828-29 (Bankr. E.D. Va. 1997).  Judge Tice concluded Virginia courts would look to the specific language employed in a security agreement in deciding whether an indebtedness was intended by the parties to be secured:

> Notwithstanding the weight of this case law, the court notes that Virginia's judiciary has adopted a rather strict approach when asked to construe the language used by parties in their agreements.  For instance, in *Graham v. Commonwealth*, 206 Va. 431, 143 S.E.2d 831 (1965), the defendant argued that the phrase "price agreed upon" should have been interpreted by the trial court as "price *to be* agreed upon." The supreme court held, however, that "[t]he contract could have been written . . . in such a manner as to have the meaning for which defendant now argues, but it was not so written and the words used in the contract as written must be given their plain meaning and other words may not be added to change the meaning of those written." *Id.* 143 S.E.2d at 834.  Similarly, in *Seoane v. Drug Emporium, Inc.*, 249 Va. 469, 457 S.E.2d 93 (1995), the trial court had looked for the "commercially reasonable interpretation" of a lease.  *Id.* 457 S.E.2d at 95.  The supreme court reversed, ruling that "if such contractual language is unambiguous, . . . we do not apply rules of construction or interpretation; we simply give the language its plain meaning.  Thus, 'commercially reasonable' considerations are immaterial in applying these unambiguous provisions. " *Id.* at 96 (citations omitted).  *See also Blue Cross of Southwestern Va. v. McDevitt & St. Co.*, 234 Va. 191, 360 S.E.2d 825, 827 (1987) (stating that, although printed form contracts should be construed against the party who supplies them, "[t]he rule applies . . . only when the contract is ambiguous on its face").

> Applying these principles to the present dispute, the court concludes that Virginia's judiciary would not require the Worlands' judgment debt to be explicitly referenced in the security agreement, to be in the same class as the automobile loan, or even to be specifically contemplated by the parties when the agreement was executed.  Giving the language in the agreement its "plain meaning," the debtor pledged his vehicle as security both for the loan from Hanover and for "any other debt [he and 'each other person or legal entity . . . who agrees to pay this note' has] with [Hanover and 'its successors and assigns'] now or later."  These provisions contain no ambiguity, and the court thus has no latitude to employ public policy to alter their meaning.

53

*Id.* at 829-30.  Judge Michael has found similarly:

> Blair cites case law for the principle that intent of the parties determines whether
> future advances are covered by a security agreement.  For example, in *Kitmitto*, the
> court held (1) that the intent of the parties was determinative of the question of
> whether a security agreement covers future advances, and (2) that the required intent
> can be determined from the written instrument itself if its words are 'clear and
> unambiguous.'  *See Kitmitto v. First Pennsylvania Bank, N.A.*, 518 F. Supp. 297, 299
> (E.D. Pa. 1981).  Similarly, in *Berman*, the court looked to the language of the
> original security agreement, rather than the language of the subsequent notes, to
> determine whether the security agreement covered future advances. *See Safe Deposit
> Bank and Trust Co. v. Berman*, 393 F.2d 401, 404 (1st Cir. 1968).

*Brice v. Crestar Bank* (*In re Brice*), 225 B.R. 124, 129 (W.D. Va. 1998).

The question for this Court then is to look to the precise language of the Security Agreement
and conclude whether the language of the Security Agreement, which defines the "Secured
Indebtedness" thereunder as "the obligations and liabilities of [the Debtor] to Drake pursuant to the
[April 23, 2008] Note and the loans evidenced thereby, whether now existing or hereafter incurred"
includes the monies advanced by Drake.  In other words, were the monies loaned by Drake actually
advanced by Drake as "loans" under the April 23, 2008 Note as documented by the Twenty-Six
Notes or were the Twenty-Six Notes actually independent obligations not related to the April 23,
2008 Note?

C.  Is Drake Entitled to Entry of Summary Judgment on the Issue of Whether the Monies
Advanced by Him are Secured by the MetLife Policy?

The assertions relied upon by Drake to establish the advances made by him were in fact
intended to be loans under the April 23, 2008 Note are found principally in the Supplemental
Affidavit of Wilson Drake and are as follows:

1.  Drake funded the April 23, 2008 Note through twenty-six advances.  Supplemental

54

Affidavit ¶ 4.

2. Wilson Drake states "[w]ith each advance made pursuant to the line of credit, for purposes of documentation and a 'paper trail,' I signed a promissory note on behalf of the [Debtor] and I booked the amount advanced into an account in the [Debtor]'s general ledger identified as 'Account 1-250-311.' Each promissory note has a handwritten or typed reference to 'Acct 1-250-311' for purposes of identifying the advance to the loan account. Roger Drake confirmed each advance under the line of credit, shown by his signature on each promissory note." *Id.* ¶ 5.

3. Wilson Drake kept a file of the promissory notes and copies of Drake's checks or other evidence of the advances under the April 23, 2008 Note, most of which also contain a reference to "Acct 1-250-311." *Id.* ¶ 6.

4. The Debtor and Drake neglected to document the assignment of the MetLife Policy until April 23, 2008. The Debtor continued to execute the individual promissory notes with each advance, and each advance was booked to the same account on the general ledger of the Debtor. *Id.* ¶ 7.

5. Drake and the Debtor agreed in the course of dealings to modify the line of credit and increase the $800,000.00 limit. Commencing in January 2008 and at all times thereafter, the Debtor considered the ongoing advances pursuant to the line of credit to be secured by the MetLife Policy. *Id.* ¶ 8.

The Trustee raises a number of issues contesting these conclusions. First, the Trustee notes "that the Plaintiff has produced one check for each Promissory Note that corresponds to the exact date and amount of each Note, with the exception of three Notes. The three exceptions relate to the

Promissory Note dated January 18, 2008, in the amount of $10,000, the Promissory Note dated May

10, 2009,[28] in the amount of $50,000, and the Promissory Note dated August 20, 2008, in the amount

of $10,000" and "[f]urther, all but four (4) of the checks produced by Plaintiff as proof of advances

under the Promissory Notes have the word 'loan' written in the memo section." Trustee's

Supplemental Memorandum, at 4.  Secondly, the Trustee attempts to undermine the assertion of

Wilson Drake that the account designation on a majority of the Twenty-Six Notes is indicative of

their relatedness to the April 23, 2008 Note:

> [S]ome of the Promissory Notes contain a notation referencing "Acct 1-250-311."
> Plaintiff suggests that this notation is somehow evidence that he intended the loans
> under the Promissory Notes to be considered advances under the [April 23, 2008]
> Note.  Interestingly, Plaintiff does not provide either the name or description given
> to Acct 1-250-311, and does not state that this designation was established
> specifically for documenting advances under the [April 23, 2008] Note. Clearly, this
> designation could not have been established to document advances under the [April
> 23, 2008] Note, as the designation appears on some of the Promissory Notes dated
> prior to April 23, 2008 (the date on which the Line of Credit Note was executed).
> More importantly, however, the notation referencing "Acct 1-250-311" is not the
> only designation used on four (4) of the Promissory Notes.  These are as follows: (a)
> Promissory Note dated May 10, 2008, which references "Acct 1-250-341"; (b)
> Promissory Note dated April 23, 2008, which references "Acct 1-250- 341"; (c)
> Promissory Note dated April 30, 2008, which references "Acct 1-250-312" and (d)
> Promissory Note dated May 2, 2008, which references "Acct 1-250-312." Plaintiff
> does not explain the reason behind the use of these other designations.
> Notwithstanding the affidavits, it does not appear that there was any special
> designation set up exclusively for documenting the advances under the Line of
> Credit.

*Id*. at 5.  Thirdly, the Trustee argues "that there is no reference to a security interest in any of the

Promissory Notes," that "[e]ach Promissory Note on its face appears to be a separate individual

---

[28]  While the Trustee asserts that there is one promissory note dated May 10, 2009, the
Court, upon review of the Twenty-Six Notes, which  are attached as part of Exhibit 1 to Drake's
Memorandum in Support of Motion for Partial Summary Judgment, believes the Trustee
intended to refer to the promissory note dated May 10, 2008.

transaction," and that "[t]here is no evidence in the language of the Promissory Notes that there are any other loans or obligations to which the loans under the Promissory Notes relate," even those notes executed after execution of the April 23, 2008 Note. *Id.* at 5-6. Finally, the Trustee argues "that the Promissory Notes have different demand dates and interest rates from those found in the [April 23, 2008] Note." *Id.* at 6.

In Schedule D filed on January 14, 2009, the Debtor, in delineating its secured claims, does not list the April 23, 2008 Note but does list each of the Twenty-Six Notes as secured by the Metlife Policy.[29] Each of the Twenty-Six Notes is listed with Account Number "1-250-311." The Debtor filed an amended Schedule D on May 5, 2009, which did not alter either the scheduling of the Twenty-Six Notes as secured by the MetLife Policy or their Account Number designations of "1-250-311."

While Drake has adduced substantial evidence supporting his contention that the monies advanced by him here were pursuant to the April 23, 2008 Note, nonetheless the Court believes a material factual dispute remains to be resolved here. As Judge Williams has reminded:

> It is inappropriate for a jury to make its decision based solely on who produced more witnesses. The jury has the further obligation to weigh the credibility of those witnesses. While the number and quality of the witnesses plays an important role in determining the weight to be given the testimony, it is the function of the trier of fact, not the judge at the summary judgment phase, to do the weighing. *See Liberty Lobby*, 477 U.S. at 249 ("[I]t is clear enough from our recent cases that at the summary judgment phase the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

---

[29] On January 29, 2009, March 4, 2009, and on April 10, 2009, the Debtor filed certain amended bankruptcy schedules but did not amend Schedule D as to the loans secured by the MetLife Policy.

*Moore v. Morton*, No. 91-2603, 1992 WL 46292, at *4 (4th Cir. Apr. 2, 1992) (unpublished table decision).

Much of the connection of the April 23, 2008 Note and the Twenty-Six Notes relied on by Drake is the account number designation of "1-250-311" affirmed by Wilson Drake; the fact-finding would benefit here from further explanation of this designation and its origins, which apparently occurred prior to the making of the April 23, 2008 Note, and the use of other account number designations in connection with some of the Twenty-Six Notes. Further explanation of the course of dealing between Drake and the Debtor as to the advancement of monies by Drake would similarly enlighten, and the assertions contained in Wilson Drake's Supplemental Affidavit should be tested by examination in order to fairly resolve this remaining issue. Accordingly, the Court finds that the Partial Summary Judgment Motion should be denied as to the issue of the validity of the Drake Lien.

It is imperative to note what is seemingly uncontradicted. The Trustee does not appear to challenge the assignment (*see* Trustee's Objection ¶ 17) or the perfection of the assignment as to third-party creditors. The Trustee also does not contend that money failed to change hands between Drake and the Debtor. The Trustee also does not appear to contest that, if the pre-existing debt is in fact linked to the April 23, 2008 Note, the Uniform Commercial Code permits the note to incorporate that debt. What the Trustee does contest is whether the April 23, 2008 Note was funded via the Twenty-Six Notes. Thus, the one remaining piece of the puzzle is whether or not the April 23, 2008 Note and the Twenty-Six Notes are actually connected such that the Twenty-Six Notes provided funding under the April 23, 2008 Note. Without this piece of the puzzle, the Court cannot conclude at this juncture that Drake holds a valid lien. The Affidavits, while providing some information on this issue, are conclusory in nature, and the Court would benefit from a review of

58

additional documentary evidence, if such exists, such as in the form of the Debtor's accounting

ledgers or records, to determine whether the allegations of the related nature between the April 23,

2008 Note and the Twenty-Six Notes can be substantiated.

Federal Rule of Civil Procedure Rule 56(d)(1) directs the Court to specify the material facts

that remain at issue following the determination of a motion for summary judgment and to set forth

in its order what facts are not at issue.

> (1) Establishing Facts.  If summary judgment is not rendered on the whole action,
> the court should, to the extent practicable, determine what material facts are not
> genuinely at issue.  The court should so determine by examining the pleadings and
> evidence before it and by interrogating the attorneys.  It should then issue an order
> specifying what facts—including items of damages or other relief—are not genuinely
> at issue.  The facts so specified must be treated as established in the action.

Fed. R. Civ. P. 56(d)(1).  The Court finds that the only factual issue remaining for determination is

whether the funding advanced by Drake under the Twenty-Six Notes did in fact constitute funding

of the April 23, 2008 Note.  The Court also finds that the following facts have been established:

1.  Drake's claim is properly characterized as debt and not as an equity contribution.

2.  The April 23, 2008 Note and Security Agreement were properly executed by both the

Debtor and Drake.

3.  The Debtor lawfully assigned its rights in the MetLife Policy to Drake.

4.  The Assignment was acknowledged by MetLife.

5.  The Assignment was perfected as to third-party creditors.

6.  The Security Agreement creates a security interest in the MetLife Policy.

7.  If the Twenty-Six Notes provided funding under the April 23, 2008 Note, the Uniform

Commercial Code does not prevent the April 23, 2008 Note from incorporating those advances so as to make those advances secured under the April 23, 2008 Note.

8. If Drake does in fact hold a valid lien on the MetLife Policy, it is the only lien on the MetLife Policy.

9. If Drake does hold a valid lien on the MetLife Policy, the lien value exceeds the value of the policy realized by its sale pursuant to the Life Insurance Motion.

IX.   Summary

For the reasons set forth above, the Court finds that the Partial Summary Judgment Motion should be granted as to the defense and counterclaim of the Chapter 7 Trustee of recharacterization and should be denied as to the validity of the Drake Lien.

A separate Order will be entered by the Court.

The Clerk is ORDERED to forward a copy of this Memorandum Opinion to Ross C. Reeves, counsel for Roger Drake; Harry W. Jernigan, III, counsel for the Chapter 7 Trustee; Carolyn L. Camardo, Chapter 7 Trustee; Douglas M. Foley, counsel for the Debtor; and to Debera F. Conlon, Assistant United States Trustee.

**Entered at Norfolk in the Eastern District of Virginia on this 2nd day of October, 2009.**

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

60